No. 13-5302

_____

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

AMERICAN FOREST RESOURCE COUNCIL, *et al.*,

Plaintiffs-Appellants,

vs.

DANIEL M. ASHE, *et al.*,

Defendants-Appellees,

and

AUDUBON SOCIETY OF PORTLAND, *et al.*,

Defendants-Intervenors-Appellees.

_____

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

PLAINTIFFS-APPELLANTS'
OPENING BRIEF

_____

Mark C. Rutzick
MARK C. RUTZICK, Inc.
12402 Myra Virginia Ct.
Oak Hill, VA 20171
Phone/Fax: 703-870-7347
Attorney for Plaintiffs-
Appellants

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

**A.     Parties and Amici**

1.  The plaintiffs who appeared below are: American Forest Resource Council, Carpenters Industrial Council, and Douglas County, Oregon.

2.  The defendants who appeared below are: Daniel M. Ashe, Director of the U.S. Fish and Wildlife Service (FWS), and S.M.R. Jewell, Secretary of Interior (substituted for her predecessor, Ken Salazar).

3.  The defendants-intervenors who appeared below are: Audubon Society of Portland, Seattle Audubon Society, Center for Biological Diversity, Oregon Wild, Conservation Northwest, Environmental Protection Information Center and Sierra Club.

4.  There are no amici.

**B.     Rulings Under Review.**

This appeal is from two decisions by the district court (the Hon. John D. Bates, U.S.D.J.) finally deciding Plaintiffs' First, Second and Third Claims for Relief challenging the FWS decision to deny AFRC's petition under the Endangered Species Act (ESA), 16 U.S.C. § 1533, to remove from the list of threatened species the Distinct Population Segment (DPS) of the Marbled Murrelet in the states of Washington, Oregon and California:

i

1.  The Memorandum Opinion entered March 30, 2013, *reported at Am. Forest Res. Council v. Ashe*, 946 F. Supp.2d 1 (D. D.C. 2013), granting Defendants' motion for summary judgment on the First and Second Claims and remanding the challenged decision to the agency to address one issue relating to the Third Claim, ECF 50, and the accompanying Order, ECF 51; and

2.  The Memorandum Opinion entered September 5, 2013, following remand, granting Defendants' motion for summary judgment on the Third Claim, ECF 68, and the accompanying Order, ECF 69.

Appellants are not appealing from the portions of these decisions concerning AFRC's Fourth, Fifth, Sixth or Seventh Claims, which challenged FWS decisions designating critical habitat for the Marbled Murrelet under the ESA.  The district court granted FWS' motion for voluntary remand of these critical habitat decisions for the purpose of conducting a new rulemaking proceeding to revise critical habitat for the Marbled Murrelet.

## C.    Related Cases

This case has never previously been before this court, and there are no related cases currently pending in this court or any other court.

## CORPORATE DISCLOSURE STATEMENT
## PURSUANT TO FED. R. APP. P. 26.1

Plaintiffs-Appellants American Forest Resource Council, Carpenters Industrial Council, and Douglas County, Oregon have no parent companies, subsidiaries or affiliates that have issued shares to the public.

Dated this 14th day of May, 2013.

MARK C. RUTZICK, INC.

By:_____/s/ Mark C. Rutzick
        Mark C. Rutzick
        Attorney for Plaintiffs-Appellants

iii

**Table of Contents**

Glossary . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
Statement of Jurisdiction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
Statutes and Regulations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
Statement of Issues Presented For Review . . . . . . . . . . . . . . . . . . . . . . 12
Summary of Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
Standard of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
Factual Statement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
A.    The Endangered Species Act . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
B.    The Marbled Murrelet . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
C.    This Litigation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29
I.    FWS' ESA LISTING DECISIONS, PUBLISHED IN THE FEDERAL
      REGISTER AND WIDELY ACCORDED *CHEVRON* DEFERENCE, ARE
      PRECEDENTIAL AGENCY RULINGS FWS MUST EITHER FOLLOW
      OR PROVIDE A REASONED EXPLANATION FOR FAILING TO FOLLOW 29
II.   THE FWS "SIGNIFICANCE" DETERMINATION IMPERMISSIBLY
      DEPARTED WITHOUT EXPLANATION FROM 13 OF FWS' LEGALLY
      BINDING PRECEDENTS, LACKED A RATIONAL BASIS, AND WAS
      ARBITRARY AND CAPRICIOUS . . . . . . . . . . . . . . . . . . . . . . . . . . . 40
A.    The "significant gap" determination was arbitrary and capricious . . . . . . 42
1.    All three findings supporting the "significant gap" determination contradict
      binding FWS precedents, without acknowledgment or explanation . . . . . 42
a.    Peripheral population . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43
b.    18 percent of "total coastal distribution" . . . . . . . . . . . . . . . . . . . . 47
c.    Ecologically distinct area . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50
d.    Conclusion: FWS failed to follow its existing precedents on all three factors
      cited for its "significant gap" finding, and failed to justify its course reversal
      or its "significant gap" conclusion. Combining the three flawed reasons into
      a single decision does not make any of them lawful. . . . . . . . . . . . . . . . 52
B.    The FWS finding that the loss of the DPS would result in the loss of "unique
      genetic characteristics that are significant to the taxon" did not match any DPS
      Policy criterion, and was arbitrary and capricious. . . . . . . . . . . . . . . . . . 52
III.  THE FWS "DISCRETENESS" DETERMINATION CONFLICTS WITHOUT
      EXPLANATION WITH FIVE PRIOR CONTRARY PRECEDENTS,
      LACKED A RATIONAL BASIS, AND WAS ARBITRARY AND
      CAPRICIOUS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

A.     The district court found FWS conceded its first stated regulatory difference - incidental killing of Murrelets by fishermen - is incorrect, but failed to vacate and remand as this Court's precedent requires. . . . . . . . . . . . . . . . . . . . . . . 55

B.     FWS' finding that Canadian law protects the Marbled Murrelet and Marbled Murrelet habitat significantly better than U.S. law misinterpreted Canadian law, overlooked key measures of the Migratory Bird Treaty Act, disregarded other U.S. statutes, contrary to three prior precedents, ignored the practical insignificance of the Canadian statutory measures, contrary to two prior precedents, and improperly discounted the most important U.S. "existing regulatory mechanism" because it could be changed in the future. . . . . . . 57

1.     FWS misinterpreted Canadian law, and overlooked the plain language of the Migratory Bird Treaty Act, in its finding that section 32 of the Canadian Species At Risk Act protects the Marbled Murrelet significantly better than the MBTA. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

2.     FWS' conclusion that section 33 of SARA protects Murrelet habitat significantly better than U.S. law was impermissibly based solely on a comparison of the text of the competing statutes, contradicting two prior precedents that disregarded textual differences in favor of examining practical differences between competing statutes. . . . . . . . . . . . . . . . . . . . . . . . . . 59

3.     Section 33 of SARA protects only 123 Murrelet nest trees out of the millions of available Murrelet nest trees in the entire country of Canada, making the practical impact of the textual protection insignificant. . . . . . . . . . . . . . . 61

4.     FWS ignored two prior precedents by disregarding major U.S. statutes upon which it had previously relied, and the district court erred by assuming FWS had considered the statutes because they were cited in a document in the record. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

5.     FWS arbitrarily and capriciously failed to consider the most important U.S. "existing regulatory mechanism," the Northwest Forest Plan, because it could be changed in the future. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

C.     FWS did not find that the lower U.S. criminal penalties under MBTA are "significant in light of" existing regulatory mechanisms. . . . . . . . . . . . . . 67

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

## Table of Authorities

<u>**Cases**</u>

*Am. Forest Res. Council v. Dep't of Interior*, Civil No.02-6087-AA (D. Or.)......... 25

*Am. Forest Res. Council v. Hall*, 533 F.Supp.2d 84 (D.D.C. 2008) .................26,27

*Ariz. Cattle Growers' Ass'n v. Kempthorne,* 534 F.Supp.2d 1013 (D. Ariz. 2008) ..31

*Arobelidze v. Holder*, 653 F.3d 513 (7th Cir. 2011) ..................................................34

*Babbitt v. Sweet Home Chapter of Cmtys. for a Great Or.,* 515 U.S. 687 (1995) .20

*Bennett v. Spear*, 520 U.S. 154, 170 (1997) 21

*Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281(1974) ....48

*Casino Airlines, Inc. v. National Transp. Safety Bd.*, 439 F.3d 715
(D.C. Cir. 2006) ........................................................................................52

*Center for Biol. Diversity v. Lubchenco*, 758 F.Supp.2d 945 (N.D. Cal. 2010) ... 61

*\*Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*,
467 U.S. 837 (1984) ....................................................... 23, 30, 34

*Def. of Wildlife v. Salazar*, 729 F.Supp.2d 1207 (D. Mont. 2010) .....................31, 35

*De Leon-Ochoa v. Attorney General of U.S.*, 622 F.3d 341 (3rd Cir. 2010) .............34

*\*Fed. Comm'ns Comm. v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009) ........32

*Garcia-Quintero v. Gonzales*, 455 F.3d 1006 (9th Cir. 2006) ...................................34

*High Sierra Hikers Ass'n v. Blackwell*, 390 F.3d 630 (9th Cir. 2004) ......................35

*In re Polar Bear Endangered Species Act Listing and 4(d) Rule Litigation*, 794
F.Supp.2d 65 (D. D.C. 2011) ...........................................................................30

*In re Polar Bear Endangered Species Act Listing and Section 4(d) Rule
Litigation--MDL No. 1993*, 709 F.3d 1, 7-8 (D.C. Cir.), *cert. denied*, 134 S. Ct. 310
(2013) ................................................................................................. 30,36

*\*Jicarilla Apache Nation v. U.S. Dept. of Interior*, 613 F.3d 1112
(D.C. Cir. 2010) ......................................................................................32,35,36

*KeySpan-Ravenswood, LLC v. Fed. Energy Reg. Comm.*, 348 F.3d 1053
(D.C. Cir. 2003) ..........................................................................................49,50

*LePage's 2000, Inc. v. Postal Regulatory Com'n*, 642 F.3d 225 (D.C. Cir. 2011) .. 65

*Lockhart v. Napolitano*, 573 F.3d 251 (6th Cir. 2009) ..............................................34

*Modesto Irr. Dist. v. Gutierrez*, 619 F.3d 1024 (9th Cir. 2010) ................................23

*Nathel v. C.I.R.*, 615 F.3d 83 (2d Cir. 2010) ............................................................ 34

*Nat'l Wildlife Fed. v. Norton*, 386 F.Supp.2d 553 (D. Vt. 2005) ............................31

*Nat'l Ass'n of Homebuilders v. Norton*, 340 F.3d 835 (9th Cir. 2003) ..........24,35,47

*\*Nat. Fuel Gas Supply Corp. v. Fed. Energy Reg. Comm.*, 468 F.3d 831
(D.C. Cir. 2006) ........................................................................................42,56

*Northern Cal. River Watch v. Wilcox*, 633 F.3d 766 (9th Cir. 2010) ........................30

*Nw. Ecosystem Alliance v. U.S. Fish and Wildlife Serv.*, 475 F.3d 1136
    (9th Cir. 2007) ..................................................................................23,43,44,50

*Railway Labor Executives' Ass'n v. U.S. R.R. Retirement Bd.*, 749 F.2d 856
    (D.C. Cir. 1984) ........................................................................................58

*River Street Donuts, LLC v. Napolitano*, 558 F.3d 111 (1st Cir. 2009) ....................34

*Roberts v. U.S.*, 741 F.3d 152 (D.C. Cir. 2014) ........................................................20

*Seattle Audubon Soc'y v. Lyons*, 871 F.Supp. 1291 (W.D. Wash.1994), *aff'd, Seattle Audubon Soc'y v. Moseley*, 80 F.3d 1401 (9th Cir. 1996) ..................................66

*Sw. Ctr. for Biol. Diversity v. Babbitt*, 926 F.Supp. 920 (D. Ariz. 1996) ..........31,35

*Tennessee Valley Auth. v. Hill*, 437 U.S. 153 (1978) ........................................21, 22

*W.R. Grace & Co. v. Env'l Prot. Agency*, 261 F.3d 330 (3rd Cir. 2001) ................65

*Western Watersheds Proj. v. Ashe*, 948 F.Supp.2d 1166 (D. Id. 2013) ....................31

## Statutes

16 U.S.C. 707 ....................................................................................................67

16 U.S.C. §1532(6) ............................................................................................21

16 U.S.C. §1532(15) ..........................................................................................23

16 U.S.C. §1532(15) (1973) ..............................................................................23

16 U.S.C. §1532 (19) ........................................................................................21

16 U.S.C. § 1533 ..............................................................................................12

16 U.S.C. §1533(a)(1) ......................................................................................23

16 U.S.C. §1533(a)(1)(D) ..............................................................................54,67

16 U.S.C. §1533(a)(2) ......................................................................................21

16 U.S.C. §1533(a)(3) ......................................................................................21

16 U.S.C. §1533(b)(1)(A) ................................................................................23

16 U.S.C. § 1533(b)(3) ....................................................................................21

16 U.S.C. § 1533(b)(3)(B) ..............................................................................21

16 U.S.C. § 1533(b)(3)(B)(ii) ..........................................................................22

16 U.S.C. § 1533(b)(3)(B)(iii) ..........................................................................22

16 U.S.C. § 1533(b)(4) ....................................................................................22

16 U.S.C. §1533(c)(1) ......................................................................................20

16 U.S.C. § 1533(c)(2) ......................................................................................25

16 U.S.C. §1533(d) ..........................................................................................21

16 U.S.C. §1536(a) ..........................................................................................21

16 U.S.C. §1538 ..............................................................................................21

16 U.S.C. §1540(c) ...........................................................................1
16 U.S.C. §1540(g) ...........................................................................1
National Forest Management Act, 16 U.S.C. §§1600 *et seq.* ....................................63
Federal Land Policy and Management Act, 43 U.S.C. §§ 1701 *et seq* .................63

**Other Authorities**

Fed.R.Civ.P. 54(b) ...........................................................................2
FWS and NMFS Joint Policy Regarding the Recognition of Distinct Vertebrate Population Segments Under the Endangered Species Act. 61 Fed. Reg. 4722 (February 7, 1996) ...........................................................................12
57 Fed. Reg. 45328 (October 1, 1992) ...................................................24
68 Fed. Reg. 34628 (June 10, 2003) ...................................................43,44
71 Fed. Reg. 26009 (May 3, 2006) ...................................................43
71 Fed. Reg. 19454 (April 14, 2006) ...................................................44,47,49
71 Fed. Reg. 26009 (May 3, 2006) ...................................................45
71 Fed. Reg. 56228 (September 26, 2006) ...................................................43,45,49,60
73 Fed. Reg. 79827 (December 30, 2008) ...................................................60
75 Fed. Reg. 6467 (February 9, 2010) ...................................................45
75 Fed. Reg. 8619 (February 25, 2010) ...................................................46,51
75 Fed. Reg. 17359 (April 6, 2010) ...................................................51
75 Fed. Reg. 19929 (April 16, 2010) ...................................................64
75 Fed. Reg. 53628 (September 1, 2010) ...................................................46
76 Fed. Reg. 14234 (March 15, 2011) ...................................................64
76 Fed. Reg. 61327 (October 4, 2011) ...................................................46
76 Fed. Reg. 61886 (October 5, 2011) ...................................................51
78 Fed. Reg. 61775 (October 3, 2013) ...................................................38,39

\* Authorities upon which we chiefly rely are marked with asterisks

### *Glossary*

DPS Policy –    Policy Regarding the Recognition of Distinct Vertebrate Population Segments Under the Endangered Species Act (February 7, 1996)

ESA –    Endangered Species Act, 16 U.S.C. §§ 1531 *et seq.*

MBTA –    Migratory Bird Treaty Act, 16 U.S.C. §§ 701 *et seq.*

NMFS –    National Marine Fisheries Service

Not Warranted
 Decision –    Decision by FWS on January 21, 2010 to deny AFRC's delisting petition and "determine that removing the Murrelet from the List is not warranted." AR 0001-11.

SARA –    Species At Risk Act (Canada S.C. 2002, c. 29)

USGS –    U.S. Geological Survey

### *Statement of Jurisdiction*

1.   In the district court, plaintiffs American Forest Resource Council, Carpenters Industrial Council, and Douglas County, Oregon ("AFRC") asserted jurisdiction under 16 U.S.C. §1540(c) and (g) and 28 U.S.C. §1331.

2.  This court has jurisdiction over this appeal under 28 U.S.C. §1291.  AFRC filed its notice of appeal on September 27, 2013, within 60 days after the September 5, 2013 Order and Memorandum Opinion.  On January 9, 2014 this Court filed an Order To Show Cause directing AFRC to show cause "why this appeal should not be

1

dismissed for lack of a final order." Order To Show Cause at 1. On January 10, 2014 AFRC filed an unopposed motion in the district court under Fed.R.Civ.P. 54(b) for an order directing entry of final judgment as to Plaintiffs' First, Second and Third Claims for Relief, and for an express determination that there is no just reason to delay the entry of final judgment as to those claims. On January 22, 2014 the district court granted the motion and "ORDERED that the Court 'expressly determines that there is no just reason for delay' of an entry of final judgment on plaintiffs' First, Second, and Third claims for relief; and ... that final judgment is entered on plaintiffs' First, Second, and Third claims for relief, pursuant to Federal Rule of Civil Procedure 54(b)." ECF 75. The order was accompanied by a Memorandum Opinion. ECF 76. AFRC advised this Court of the district court order, and on March 5, 2013 the Court "ORDERED that the order to show cause be discharged, without prejudice to the merits panel to which this case is assigned reviewing the propriety of the district court's entry of final judgment on appellants' first, second, and third claims for relief under Fed. R. Civ. P. 54(b)."

### Statutes and Regulations

1.      Endangered Species Act, 16 U.S.C. §1533(a)-(d)

(a) Generally
(1) The Secretary shall by regulation promulgated in accordance with subsection (b)

2

of this section determine whether any species is an endangered species or a threatened species because of any of the following factors:

(A) the present or threatened destruction, modification, or curtailment of its habitat or range;

(B) overutilization for commercial, recreational, scientific, or educational purposes;

(C) disease or predation;

(D) the inadequacy of existing regulatory mechanisms; or

(E) other natural or manmade factors affecting its continued existence.

(2) With respect to any species over which program responsibilities have been vested in the Secretary of Commerce pursuant to Reorganization Plan Numbered 4 of 1970—

(A) in any case in which the Secretary of Commerce determines that such species should—

(i) be listed as an endangered species or a threatened species, or

(ii) be changed in status from a threatened species to an endangered species,

he shall so inform the Secretary of the Interior; who shall list such species in accordance with this section;

(B) in any case in which the Secretary of Commerce determines that such species should—

(i) be removed from any list published pursuant to subsection (c) of this section, or

(ii) be changed in status from an endangered species to a threatened species,

he shall recommend such action to the Secretary of the Interior, and the Secretary of the Interior, if he concurs in the recommendation, shall implement such action; and

(C) the Secretary of the Interior may not list or remove from any list any such species, and may not change the status of any such species which are listed, without a prior favorable determination made pursuant to this section by the Secretary of Commerce.

(3)

(A) The Secretary, by regulation promulgated in accordance with subsection (b) of this section and to the maximum extent prudent and determinable—

(i) shall, concurrently with making a determination under paragraph (1) that a species is an endangered species or a threatened species, designate any habitat of such species which is then considered to be critical habitat; and

(ii) may, from time-to-time thereafter as appropriate, revise such designation.

(B)

(i) The Secretary shall not designate as critical habitat any lands or other geographical areas owned or controlled by the Department of Defense, or designated for its use,

that are subject to an integrated natural resources management plan prepared under section 670a of this title, if the Secretary determines in writing that such plan provides a benefit to the species for which critical habitat is proposed for designation.

(ii) Nothing in this paragraph affects the requirement to consult under section 1536 (a)(2) of this title with respect to an agency action (as that term is defined in that section).

(iii) Nothing in this paragraph affects the obligation of the Department of Defense to comply with section 1538 of this title, including the prohibition preventing extinction and taking of endangered species and threatened species.

(b) Basis for determinations

(1)

(A) The Secretary shall make determinations required by subsection (a)(1) of this section solely on the basis of the best scientific and commercial data available to him after conducting a review of the status of the species and after taking into account those efforts, if any, being made by any State or foreign nation, or any political subdivision of a State or foreign nation, to protect such species, whether by predator control, protection of habitat and food supply, or other conservation practices, within any area under its jurisdiction; or on the high seas.

(B) In carrying out this section, the Secretary shall give consideration to species which have been—

(i) designated as requiring protection from unrestricted commerce by any foreign nation, or pursuant to any international agreement; or

(ii) identified as in danger of extinction, or likely to become so within the foreseeable future, by any State agency or by any agency of a foreign nation that is responsible for the conservation of fish or wildlife or plants.

(2) The Secretary shall designate critical habitat, and make revisions thereto, under subsection (a)(3) of this section on the basis of the best scientific data available and after taking into consideration the economic impact, the impact on national security, and any other relevant impact, of specifying any particular area as critical habitat. The Secretary may exclude any area from critical habitat if he determines that the benefits of such exclusion outweigh the benefits of specifying such area as part of the critical habitat, unless he determines, based on the best scientific and commercial data available, that the failure to designate such area as critical habitat will result in the extinction of the species concerned.

(3)

(A) To the maximum extent practicable, within 90 days after receiving the petition

4

of an interested person under section 553 (e) of title 5, to add a species to, or to remove a species from, either of the lists published under subsection (c) of this section, the Secretary shall make a finding as to whether the petition presents substantial scientific or commercial information indicating that the petitioned action may be warranted. If such a petition is found to present such information, the Secretary shall promptly commence a review of the status of the species concerned. The Secretary shall promptly publish each finding made under this subparagraph in the Federal Register.

(B) Within 12 months after receiving a petition that is found under subparagraph (A) to present substantial information indicating that the petitioned action may be warranted, the Secretary shall make one of the following findings:

(i) The petitioned action is not warranted, in which case the Secretary shall promptly publish such finding in the Federal Register.

(ii) The petitioned action is warranted, in which case the Secretary shall promptly publish in the Federal Register a general notice and the complete text of a proposed regulation to implement such action in accordance with paragraph (5).

(iii) The petitioned action is warranted, but that—

(I) the immediate proposal and timely promulgation of a final regulation implementing the petitioned action in accordance with paragraphs (5) and (6) is precluded by pending proposals to determine whether any species is an endangered species or a threatened species, and

(II) expeditious progress is being made to add qualified species to either of the lists published under subsection (c) of this section and to remove from such lists species for which the protections of this chapter are no longer necessary,

in which case the Secretary shall promptly publish such finding in the Federal Register, together with a description and evaluation of the reasons and data on which the finding is based.

(C)

(i) A petition with respect to which a finding is made under subparagraph (B)(iii) shall be treated as a petition that is resubmitted to the Secretary under subparagraph (A) on the date of such finding and that presents substantial scientific or commercial information that the petitioned action may be warranted.

(ii) Any negative finding described in subparagraph (A) and any finding described in subparagraph (B)(i) or (iii) shall be subject to judicial review.

(iii) The Secretary shall implement a system to monitor effectively the status of all species with respect to which a finding is made under subparagraph (B)(iii) and shall

make prompt use of the authority under paragraph 7 [1] to prevent a significant risk to the well being of any such species.

(D)

(i) To the maximum extent practicable, within 90 days after receiving the petition of an interested person under section 553 (e) of title 5, to revise a critical habitat designation, the Secretary shall make a finding as to whether the petition presents substantial scientific information indicating that the revision may be warranted. The Secretary shall promptly publish such finding in the Federal Register.

(ii) Within 12 months after receiving a petition that is found under clause (i) to present substantial information indicating that the requested revision may be warranted, the Secretary shall determine how he intends to proceed with the requested revision, and shall promptly publish notice of such intention in the Federal Register.

(4) Except as provided in paragraphs (5) and (6) of this subsection, the provisions of section 553 of title 5 (relating to rulemaking procedures), shall apply to any regulation promulgated to carry out the purposes of this chapter.

(5) With respect to any regulation proposed by the Secretary to implement a determination, designation, or revision referred to in subsection (a)(1) or (3) of this section, the Secretary shall—

(A) not less than 90 days before the effective date of the regulation—

(i) publish a general notice and the complete text of the proposed regulation in the Federal Register, and

(ii) give actual notice of the proposed regulation (including the complete text of the regulation) to the State agency in each State in which the species is believed to occur, and to each county, or equivalent jurisdiction in which the species is believed to occur, and invite the comment of such agency, and each such jurisdiction, thereon;

(B) insofar as practical, and in cooperation with the Secretary of State, give notice of the proposed regulation to each foreign nation in which the species is believed to occur or whose citizens harvest the species on the high seas, and invite the comment of such nation thereon;

(C) give notice of the proposed regulation to such professional scientific organizations as he deems appropriate;

(D) publish a summary of the proposed regulation in a newspaper of general circulation in each area of the United States in which the species is believed to occur; and

(E) promptly hold one public hearing on the proposed regulation if any person files a request for such a hearing within 45 days after the date of publication of general

notice.

(6)

(A) Within the one-year period beginning on the date on which general notice is published in accordance with paragraph (5)(A)(i) regarding a proposed regulation, the Secretary shall publish in the Federal Register—

(i) if a determination as to whether a species is an endangered species or a threatened species, or a revision of critical habitat, is involved, either—

(I) a final regulation to implement such determination,

(II) a final regulation to implement such revision or a finding that such revision should not be made,

(III) notice that such one-year period is being extended under subparagraph (B)(i), or

(IV) notice that the proposed regulation is being withdrawn under subparagraph (B)(ii), together with the finding on which such withdrawal is based; or

(ii) subject to subparagraph (C), if a designation of critical habitat is involved, either—

(I) a final regulation to implement such designation, or

(II) notice that such one-year period is being extended under such subparagraph.

(B)

(i) If the Secretary finds with respect to a proposed regulation referred to in subparagraph (A)(i) that there is substantial disagreement regarding the sufficiency or accuracy of the available data relevant to the determination or revision concerned, the Secretary may extend the one-year period specified in subparagraph (A) for not more than six months for purposes of soliciting additional data.

(ii) If a proposed regulation referred to in subparagraph (A)(i) is not promulgated as a final regulation within such one-year period (or longer period if extension under clause (i) applies) because the Secretary finds that there is not sufficient evidence to justify the action proposed by the regulation, the Secretary shall immediately withdraw the regulation. The finding on which a withdrawal is based shall be subject to judicial review. The Secretary may not propose a regulation that has previously been withdrawn under this clause unless he determines that sufficient new information is available to warrant such proposal.

(iii) If the one-year period specified in subparagraph (A) is extended under clause (i) with respect to a proposed regulation, then before the close of such extended period the Secretary shall publish in the Federal Register either a final regulation to implement the determination or revision concerned, a finding that the revision should not be made, or a notice of withdrawal of the regulation under clause (ii), together

7

with the finding on which the withdrawal is based.

(C) A final regulation designating critical habitat of an endangered species or a threatened species shall be published concurrently with the final regulation implementing the determination that such species is endangered or threatened, unless the Secretary deems that—

(i) it is essential to the conservation of such species that the regulation implementing such determination be promptly published; or

(ii) critical habitat of such species is not then determinable, in which case the Secretary, with respect to the proposed regulation to designate such habitat, may extend the one-year period specified in subparagraph (A) by not more than one additional year, but not later than the close of such additional year the Secretary must publish a final regulation, based on such data as may be available at that time, designating, to the maximum extent prudent, such habitat.

(7) Neither paragraph (4), (5), or (6) of this subsection nor section 553 of title 5 shall apply to any regulation issued by the Secretary in regard to any emergency posing a significant risk to the well-being of any species of fish or wildlife or plants, but only if—

(A) at the time of publication of the regulation in the Federal Register the Secretary publishes therein detailed reasons why such regulation is necessary; and

(B) in the case such regulation applies to resident species of fish or wildlife, or plants, the Secretary gives actual notice of such regulation to the State agency in each State in which such species is believed to occur.

Such regulation shall, at the discretion of the Secretary, take effect immediately upon the publication of the regulation in the Federal Register. Any regulation promulgated under the authority of this paragraph shall cease to have force and effect at the close of the 240-day period following the date of publication unless, during such 240-day period, the rulemaking procedures which would apply to such regulation without regard to this paragraph are complied with. If at any time after issuing an emergency regulation the Secretary determines, on the basis of the best appropriate data available to him, that substantial evidence does not exist to warrant such regulation, he shall withdraw it.

(8) The publication in the Federal Register of any proposed or final regulation which is necessary or appropriate to carry out the purposes of this chapter shall include a summary by the Secretary of the data on which such regulation is based and shall show the relationship of such data to such regulation; and if such regulation designates or revises critical habitat, such summary shall, to the maximum extent

practicable, also include a brief description and evaluation of those activities (whether public or private) which, in the opinion of the Secretary, if undertaken may adversely modify such habitat, or may be affected by such designation.

(c) Lists

(1) The Secretary of the Interior shall publish in the Federal Register a list of all species determined by him or the Secretary of Commerce to be endangered species and a list of all species determined by him or the Secretary of Commerce to be threatened species. Each list shall refer to the species contained therein by scientific and common name or names, if any, specify with respect to each such species over what portion of its range it is endangered or threatened, and specify any critical habitat within such range. The Secretary shall from time to time revise each list published under the authority of this subsection to reflect recent determinations, designations, and revisions made in accordance with subsections (a) and (b) of this section.

(2) The Secretary shall—

(A) conduct, at least once every five years, a review of all species included in a list which is published pursuant to paragraph (1) and which is in effect at the time of such review; and

(B) determine on the basis of such review whether any such species should—

(i) be removed from such list;

(ii) be changed in status from an endangered species to a threatened species; or

(iii) be changed in status from a threatened species to an endangered species.

Each determination under subparagraph (B) shall be made in accordance with the provisions of subsections (a) and (b) of this section.

(d) Protective regulations

Whenever any species is listed as a threatened species pursuant to subsection (c) of this section, the Secretary shall issue such regulations as he deems necessary and advisable to provide for the conservation of such species. The Secretary may by regulation prohibit with respect to any threatened species any act prohibited under section 1538 (a)(1) of this title, in the case of fish or wildlife, or section 1538 (a)(2) of this title, in the case of plants, with respect to endangered species; except that with respect to the taking of resident species of fish or wildlife, such regulations shall apply in any State which has entered into a cooperative agreement pursuant to section 1535 (c) of this title only to the extent that such regulations have also been adopted by such State.

2.  Migratory Bird Treaty Act, 16 U.S.C. §703(a)

(a) In general
Unless and except as permitted by regulations made as hereinafter provided in this subchapter, it shall be unlawful at any time, by any means or in any manner, to pursue, hunt, take, capture, kill, attempt to take, capture, or kill, possess, offer for sale, sell, offer to barter, barter, offer to purchase, purchase, deliver for shipment, ship, export, import, cause to be shipped, exported, or imported, deliver for transportation, transport or cause to be transported, carry or cause to be carried, or receive for shipment, transportation, carriage, or export, any migratory bird, any part, nest, or egg of any such bird, or any product, whether or not manufactured, which consists, or is composed in whole or part, of any such bird or any part, nest, or egg thereof, included in the terms of the conventions between the United States and Great Britain for the protection of migratory birds concluded August 16, 1916 (39 Stat. 1702), the United States and the United Mexican States for the protection of migratory birds and game mammals concluded February 7, 1936, the United States and the Government of Japan for the protection of migratory birds and birds in danger of extinction, and their environment concluded March 4, 1972, and the convention between the United States and the Union of Soviet Socialist Republics for the conservation of migratory birds and their environments concluded November 19, 1976.

3.  Migratory Bird Treaty Act, 16 U.S.C. § 704(b)
(b) It shall be unlawful for any person to—
(1) take any migratory game bird by the aid of baiting, or on or over any baited area, if the person knows or reasonably should know that the area is a baited area; or
(2) place or direct the placement of bait on or adjacent to an area for the purpose of causing, inducing, or allowing any person to take or attempt to take any migratory game bird by the aid of baiting on or over the baited area.

4.  Migratory Bird Treaty Act, 16 U.S.C. § 707

(a) Except as otherwise provided in this section, any person, association, partnership, or corporation who shall violate any provisions of said conventions or of this subchapter, or who shall violate or fail to comply with any regulation made pursuant to this subchapter shall be deemed guilty of a misdemeanor and upon conviction

thereof shall be fined not more than $15,000 or be imprisoned not more than six months, or both.

(b) Whoever, in violation of this subchapter, shall knowingly—

(1) take by any manner whatsoever any migratory bird with intent to sell, offer to sell, barter or offer to barter such bird, or

(2) sell, offer for sale, barter or offer to barter, any migratory bird shall be guilty of a felony and shall be fined not more than $2,000 or imprisoned not more than two years, or both.

(c) Whoever violates section 704 (b)(2) of this title shall be fined under title 18, imprisoned not more than 1 year, or both.

(d) All guns, traps, nets and other equipment, vessels, vehicles, and other means of transportation used by any person when engaged in pursuing, hunting, taking, trapping, ensnaring, capturing, killing, or attempting to take, capture, or kill any migratory bird in violation of this subchapter with the intent to offer for sale, or sell, or offer for barter, or barter such bird in violation of this subchapter shall be forfeited to the United States and may be seized and held pending the prosecution of any person arrested for violating this subchapter and upon conviction for such violation, such forfeiture shall be adjudicated as a penalty in addition to any other provided for violation of this subchapter. Such forfeited property shall be disposed of and accounted for by, and under the authority of, the Secretary of the Interior.

5.      FWS and NMFS Joint Policy Regarding the Recognition of Distinct Vertebrate Population Segments Under the Endangered Species Act.  61 Fed. Reg. 4722, 4725 (February 7, 1996) (excerpts)

*Discreteness*: A population segment of a vertebrate species may be considered discrete if it satisfies either one of the following conditions:

1.   It is markedly separated from other populations of the same taxon as a consequence of physical, physiological, ecological, or behavioral factors. ...

2.  It is delimited by international governmental boundaries within which differences in control of exploitation, management of habitat, conservation status, or regulatory mechanisms exist that are significant in light of section 4(a)(1)(D) of the Act.

*Significance:* If a population segment is considered discrete under one or more of the above conditions, its biological and ecological significance will then be considered in light of Congressional guidance (see Senate Report 151, 96th Congress, 1st

Session) that the authority to list DPS's be used '' * * * sparingly'' while encouraging the conservation of genetic diversity. In carrying out this examination, the Services will consider available scientific evidence of the discrete population segment's importance to the taxon to which it belongs. This consideration may include, but is not limited to, the following:

1. Persistence of the discrete population segment in an ecological setting unusual or unique for the taxon,

2. Evidence that loss of the discrete population segment would result in a significant gap in the range of a taxon,

3. Evidence that the discrete population segment represents the only surviving natural occurrence of a taxon that may be more abundant elsewhere as an introduced population outside its historic range, or

4. Evidence that the discrete population segment differs markedly from other populations of the species in its genetic characteristics.

Because precise circumstances are likely to vary considerably from case to case, it is not possible to describe prospectively all the classes of information that might bear on the biological and ecological importance of a discrete population segment.

### *Statement of Issues Presented For Review*

In 1992 the U.S. Fish and Wildlife Service (FWS) listed the Washington, Oregon and California Marbled Murrelet population of some 20,000 birds, comprising two percent of the species' worldwide total and covering 18 percent of the species' coastal geographic distribution at its southernmost end, as a "Distinct Population Segment" (DPS) threatened under the Endangered Species Act (ESA), 16 U.S.C. § 1533.

In 1996 FWS adopted a Policy Regarding the Recognition of Distinct Vertebrate Population Segments Under the Endangered Species Act (DPS Policy)

which allows FWS to list a vertebrate population segment as a DPS only if the agency finds that the population segment is 1) "discrete" from other populations of the same species and 2) "significant to the taxon as a whole." Discreteness may be based on physical, physiological, ecological, or behavioral factors, and may also be based on an international boundary if significant regulatory differences exist between the two bordering nations. Significance is based on four biological considerations.

In 2008 AFRC petitioned FWS to delist the Murrelet DPS based on the factors in the DPS Policy. In 2010 FWS denied the petition, finding that the population was significant to the taxon as a whole, and that while there are no physical, physiological, ecological, or behavioral differences between Murrelets on both sides of the U.S-Canada boundary, international regulatory differences between the U.S. and Canada justify defining a DPS based on the U.S.-Canada boundary. The district court upheld the decision in 2013. The issues in this appeal are:

Issue 1. Whether FWS' prior ESA listing decisions, which have the force of law and are entitled to *Chevron* deference, are legally binding precedents subject to the Administrative Procedure Act (APA) rational decisionmaking requirement that an agency must either follow legally binding precedents or reasonably explain its failure to do so.

13

Issue 2. Whether FWS permissibly found the Murrelet DPS is "<u>significant to the taxon as a whole</u>" based on four factors, where prior FWS precedents hold that three of these factors are insufficient for a significance finding, and FWS never found the fourth factor satisfied any DPS criterion.

Issue 3. Whether FWS permissibly found that three regulatory differences between U.S. and Canadian law are "significant" under the DPS Policy so as to permit the U.S.-Canada boundary to define the DPS as "<u>discrete</u>," where a) FWS conceded one of the purported differences is erroneous; and b) for the other two differences, FWS misinterpreted both Canadian and U.S. laws, ignored other U.S. laws and a key U.S. regulatory enactment, contrary to precedent, and applied a textual comparison of statutes, contrary to precedent, without recognizing the absence of meaningful practical difference between laws.

## Summary of Argument

1. The Endangered Species Act requires the U.S. Fish and Wildlife Service to list species as threatened or endangered through an Administrative Procedure Act notice-and-comment rulemaking process. FWS routinely seeks *Chevron* deference for its ESA listing decisions, as it did below in this case, arguing that listing decisions have "the force of law" and are "binding on the agency." Courts throughout the

14

country have given ESA listing decisions *Chevron* deference.  Yet in this case, FWS claims it has no duty to consider or follow its prior ESA listing decisions, and no duty to explain its failure to do so.  "Every case is different," argues FWS, so no listing decision is ever a binding precedent for any future listing decision.

AFRC agrees in this case that ESA listing decisions are entitled to *Chevron* deference.  But *Chevron* deference is available <u>only</u> for agency decisions that constitute <u>legally-binding precedent</u> on the agency – that is the defining characteristic of an agency decision that is entitled to *Chevron* deference.  FWS may not disregard prior listing decisions simply because a different species is involved, any more than other federal agencies can ignore precedents because a different applicant is involved or a court can ignore precedents because a different party is involved.  Where FWS has applied a policy, approach or interpretation for a listing issue in a prior decision, that decision is a legally-binding precedent that the APA requires FWS to follow in a future listing decision or give an adequate explanation for its failure to do so.

FWS violated that APA duty in this case.  The FWS decision in this case – holding that the Marbled Murrelet population of some 20,000 birds in Washington, Oregon and California, two percent of the worldwide population, is both "significant" and "discrete" under FWS' 1996 DPS Policy and may therefore be classified as a

Distinct Population Segment (DPS) listable under the ESA – directly contradicts policies and interpretations FWS has employed in more than <u>twenty</u> of its prior legally-binding ESA listing precedents, yet FWS never acknowledged or explained a single one of these departures. FWS' violation of this APA rational decisionmaking requirement in this case was arbitrary and capricious.

2.   The FWS "significance" finding under the DPS Policy rests on two conclusions:  the loss of the DPS would create a "significant gap" in the species' range, and would cause loss of unique genetic characteristics present in a tiny group of 200 Murrelets in central California at the southernmost fringe of the species' range.

a.  FWS pointed to three factors showing that the loss of the DPS would create a "significant gap" in the species' range – the population is peripheral, it contains 18 percent of coastal geographic distribution of range, and it includes the rare redwoods region.  Yet prior FWS precedents have <u>rejected</u> each of these three factors as a basis for a "significant gap" finding – a total of 13 contrary prior precedents in all.  FWS gave no reason why this case is different, and never acknowledged any of the contrary precedents.

b.  The DPS Policy allows a population to be considered "significant" if it "differs markedly from other populations of the species in its genetic characteristics,"

16

but here FWS never made such a finding.  Rather, it said that the loss of the 200 Murrelets in central California, just one percent of the DPS population, would strip the DPS of "unique genetic characteristics that are significant to the taxon."  That statement falls far short of a "differs markedly" finding.  FWS found that 99 percent of the Murrelets in the DPS are genetically indistinguishable from virtually all other Murrelets.  Even if one percent of the DPS is genetically distinct, the DPS as a whole does not differ "markedly" from the Murrelets in Alaska and Canada.  The record offers no basis for a "differs markedly" finding, which may explain why there never was one.

3.  The DPS Policy allows international regulatory differences to demark a boundary-based DPS only when those differences are significant in light of existing regulatory mechanisms.  Differences in numbers of birds and habitat between the U.S. and Canada are not relevant unless they result from differences in existing regulatory mechanisms, and FWS never made any such finding.

FWS identified just three areas where regulatory differences exist between Canada and the U.S.: laws prohibiting incidental "bycatch" of Murrelets by fishermen; laws banning acts that threaten death or injury to Murrelets and related laws that protect Murrelet habitat; and differing maximum levels of imprisonment and

17

fines for violations of the laws.

a. FWS conceded below that it erred in finding a regulatory difference relating to "incidental bycatch of Murrelets by fishermen." That concession alone should have led to remand and vacatur.

b. FWS' belief that the Canadian Species At Risk Act (SARA), Canada's endangered species protection law, protects murrelets better than the U.S. Migratory Bird Treaty Act (MBTA) overlooked the MBTA's prohibition against "pursue" and "hunt" of Murrelets. Those terms render U.S. law stronger, not weaker, than Canadian law. FWS' belief that the Species At Risk Act protects Murrelet <u>habitat</u> better than U.S. law was based solely on a textual difference in the laws, without recognizing that the textual difference does not translate into a practical difference. Yet two prior precedents require FWS to weigh <u>practical</u> regulatory differences regardless of differing statute text. In practice, Canadian law only protects 123 previously- identified "occupied or habitually occupied" Marbled Murrelet nest trees out of the literally tens of millions of potential Marbled Murrelet nest trees in the entire country of Canada, and Murrelets are known not to return to previously occupied nest trees, making the practical regulatory difference insignificant.

FWS also ignored the substantial Marbled Murrelet habitat protection measures

18

offered by three major U.S. statutes, which its prior precedents had cited to justify denial of DPS status for other wildlife populations. The district court found FWS had not addressed any of these statutes in its decision in this case, but overlooked the error because the statutes had been cited in an earlier agency document included in the record – contrary to the well-settled rule that a court can only judge an agency's decision on its stated rationale, even if the record might have supported other grounds for the decision.

While the ESA and the DPS Policy require a species' status to be based on "existing regulatory mechanisms," FWS unlawfully violated this command by ignoring the U.S.'s most important existing regulatory mechanism – the three-state multi-agency federal forestland management directive called the Northwest Forest Plan, which protects millions of acres of U.S. Marbled Murrelet habitat, far more than are protected in Canada – solely because the Northwest Forest Plan might be changed in the future.

c. While FWS correctly observed that maximum jail terms and fines are higher in Canada than the U.S., FWS never found this textual difference had any practical impact on law enforcement or citizen behavior, and never found that U.S. laws were inadequate due to lower penalties, and thus gave no reason this textual difference

justifies a DPS classification for the Washington-Oregon-California Murrelet population.

## Standard of Review

The standard of appellate review applicable to all issues in this case is that this Court "review[s] the district court's grant of summary judgment de novo, which is to say we review the administrative action directly, according no particular deference to the judgment of the District Court." *Roberts v. U.S.*, 741 F.3d 152, 157-58 (D.C. Cir. 2014) (citation and quotations omitted).

## Factual Statement[1]

### A.     The Endangered Species Act

The ESA, enacted in 1973, is the "most comprehensive legislation for the preservation of endangered species ever enacted by any nation." *Babbitt v. Sweet Home Chapter of Cmtys. for a Great Or.,* 515 U.S. 687, 698 (1995) (citations and quotations omitted). The ESA establishes procedures to create two "lists" of species deserving legal protection, 16 U.S.C. §1533(c)(1):  a list of any "endangered species" that "is in danger of extinction throughout all or a significant portion of its range," 16

---

[1]AFRC established its Article III standing below through Declarations of Thomas L. Partin, Michael H. Pieti and Doug Robertson, ECF 33-1, 33-2 and 33-3 and the argument presented at ECF 33 at 8-11.  No party below questioned AFRC's standing.

U.S.C. §1532(6), and a list of any "threatened species" that "is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." 16 U.S.C. §1532 (19). The ESA, 16 U.S.C. §1538, subjects broadly-defined "take" of any <u>endangered</u> species of fish or wildlife to "substantial civil and criminal penalties including imprisonment," *Bennett v. Spear*, 520 U.S. 154, 170 (1997), and 16 U.S.C. §1533(d) allows the FWS or its partner conservation agency the National Marine Fisheries Service (NMFS) within the Department of Commerce (which is responsible under 16 U.S.C. §1533(a)(2) for protecting many marine and anadromous species) to adopt a regulation subjecting take of a <u>threatened</u> species to the same penalties. The listing agency also designates "critical habitat" for the conservation of each listed species. 16 U.S.C. §1533(a)(3).

Federal agencies must engage in an interagency "consultation" with FWS or NMFS (or both) to assure that their actions, funds and permits are not likely to jeopardize the continued existence of any listed species or to result in the destruction or adverse modification of any designated critical habitat. 16 U.S.C. §1536(a)-(b).

Thus, the legal consequences of listing a species of fish or wildlife as endangered or threatened are profound. "Congress intended endangered species to be afforded the highest of priorities." *Tennessee Valley Auth. v. Hill*, 437 U.S. 153,

21

174 (1978).  Protecting a listed species may "require[] the sacrifice of … many millions of dollars in public funds."  *Id*.

FWS must make listing decisions "solely on the basis of the best scientific and commercial data available."  16 U.S.C. §1533(b)(1)(A).  All listing determinations must be made "by regulation," 16 U.S.C. §1533(a)(1), following "the provisions of section 553 of title 5, United States Code (relating to rulemaking procedures)."  16 U.S.C. § 1533(b)(4).

A citizen may also trigger the regulatory listing process by submitting a petition to add a species to a list or remove a species from a list.  16 U.S.C. § 1533(b)(3).  FWS must decide within 90 days after a petition is filed whether the petition presents "substantial scientific or commercial information indicating that the petitioned action may be warranted."  *Id*.  If FWS makes such a finding, it must conduct "a review of the status of the species," *id*., and must make a final decision on the petition within 12 months after receiving the petition.  16 U.S.C. § 1533(b)(3)(B).  If FWS finds the petitioned action is warranted, it must promptly publish the complete text of a proposed regulation, and complete the rulemaking as provided in 16 U.S.C. § 1533(b)(3)(B)(ii), unless the petitioned action is precluded by other pending listing proposals.  16 U.S.C. § 1533(b)(3)(B)(iii).

The ESA only permits the listing of a "species" of fish, wildlife and plants. "The Secretary shall ... determine whether any <u>species</u> is an endangered species or a threatened species ...."  16 U.S.C. §1533(a)(1) (underlining added).  Congress originally defined a "species" in 1973 to include "any subspecies or any other group of fish or wildlife of the same species or smaller taxa in common spatial arrangement that interbreed when mature."  16 U.S.C. §1532(15) (1973).  In 1978, Congress narrowed the definition to "any subspecies of fish or wildlife or plants, and any <u>distinct population segment of any species o[f] vertebrate fish or wildlife which interbreeds when mature</u>." 16 U.S.C. §1532(15) (underlining added). "Congress did not define DPS, nor is the term used in the scientific community." *Modesto Irr. Dist. v. Gutierrez*, 619 F.3d 1024, 1028 (9th Cir. 2010).  FWS and NMFS may list a species, subspecies or DPS located anywhere in the world.

FWS and NMFS issued their DPS Policy in 1996.  The Ninth Circuit has given the DPS Policy deference under *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.* ("*Chevron*"), 467 U.S. 837 (1984), and has upheld the DPS Policy under that deferential standard of review.  *Nw. Ecosystem Alliance v. U.S. Fish and Wildlife Serv.*, 475 F.3d 1136, 1142, 1145 (9th Cir. 2007).  The Ninth Circuit has also held that listing a population of fish or wildlife in violation of the DPS Policy is unlawful.

*Nat'l Ass'n of Homebuilders v. Norton*, 340 F.3d 835, 851 (9th Cir. 2003).

**B.**  **The Marbled Murrelet**

The Marbled Murrelet is a sea bird that lives along the North American Pacific coast, primarily in Alaska, but also in Canada, Washington, Oregon, and California. "Murrelets spend most of their lives in the marine environment where they forage in nearshore areas." AR 0002. Marbled Murrelets travel inland to nest in forested and unforested areas. AR 6845.

The Marbled Murrelet is abundant in Alaska, which has a Murrelet population between 655,000 and 1,236,000 birds. AR 6793 (USGS estimate as of 2007). The Marbled Murrelet population in British Columbia is between 54,300 and 92,600 birds. AR 6796 (same). The population of Marbled Murrelets in Washington, Oregon and California is around 20,000 birds. AR 2611 (nine-year average of FWS annual estimates as of 2008).

On October 1, 1992 FWS "determine[d] the Washington, Oregon and California population of the Marbled Murrelet ... to be a threatened species." 57 Fed. Reg. 45328. FWS admitted that "some question remains whether the population listed in this rule qualifies for protection under the Act's definition of 'species.'" 57 Fed. Reg. 45330. While the DPS used the U.S.-Canada boundary to define the listed

population, FWS did not explain or justify the use of the international boundary. FWS promised "to reexamine the basis of recognizing this population of Murrelets as a 'species' under the Act. Within 90 days, the Service will announce the results of this examination and at that time may propose a regulatory change that would alter the listing of the Murrelet as a threatened species." 57 Fed. Reg. 45330. The promised reexamination never occurred, and over the next ten years FWS also failed to complete the mandatory status review the ESA requires at least every five years for each listed species under 16 U.S.C. § 1533(c)(2).

In 2002 AFRC along with three of its members filed suit in the U. S. District Court for the District of Oregon to compel FWS to conduct a five-year status review of the Murrelet DPS. *Am. Forest Res. Council v. Dep't of Interior*, Civil No.02-6087-AA (D. Or.). In 2003 the AFRC and the Department of Interior settled the case with an agreement by FWS to complete a five-year status review by December 31, 2003.

FWS completed a five-year Status Review on August 31, 2004, questioning the validity of the DPS, but nonetheless deciding "[t]here will be no change in the species status pending completion of a range-wide status review." AR 8395. But FWS never started a range-wide status review. In 2007 AFRC filed a legal challenge against the 2004 FWS decision to maintain threatened status for the DPS. However, the district

25

court ultimately decided that a five-year status review is not judicially reviewable final agency action. *Am. Forest Res. Council v. Hall*, 533 F.Supp.2d 84 (D.D.C. 2008); *see* ECF 50 at 6-7.

## C.    <u>This Litigation</u>

The district court's decision had noted that "AFRC has never petitioned FWS to conduct ... a delisting [of the DPS]."    533 F.Supp.2d at 88. On May 28, 2008, AFRC submitted a petition to remove ("delist") the DPS from the list of threatened species.  AR 2726-2737.  On October 2, 2008 FWS published a finding that the petition "presents substantial information indicating that the petitioned action may be warranted." AR 2722-25.

On June 12, 2009, while AFRC's appeal of the 2008 district court decision was pending, FWS completed another five-year review of the DPS, determining that the DPS meets the legal definition of a species under the DPS Policy and should remain listed as a threatened species.  AR 8396-8503.  The 2009 Status Review again found there is no biological basis to find the Washington, Oregon and California population is "markedly separated" from the Canadian and Alaskan birds, but concluded, contrary to its 2004 decision, that the three-state population meets the alternative "discreteness" test using the international boundary.  After the new five-year review

26

was issued, this Court dismissed as moot AFRC's appeal of the district court decision

in *Am. Forest Res. Council*, 533 F.Supp.2d 84.

On January 21, 2010 FWS denied AFRC's delisting petition and "determine[d] that removing the Murrelet from the List is not warranted." Administrative Record (AR) 0001-11 (hereafter "Not Warranted Decision"). AFRC filed this action on January 18, 2012, challenging not only the Not Warranted Decision but also FWS decisions in 1996, 2008 and 2011 designating critical habitat for the Marbled Murrelet.[2] ECF 1.

AFRC presented three claims against the Not Warranted Decision. AFRC challenged both the "significance" and "discreteness" findings required by the DPS Policy. AFRC also challenged FWS' failure to determine if the population within the DPS "interbreeds when mature," as the ESA definition of "species" requires, particularly focusing on a small genetically-distinct population of Murrelets in central

---

[2]AFRC's critical habitat claims are not involved in this appeal. AFRC and FWS agreed in August 2011 to a proposed Consent Decree vacating and remanding the FWS' 1996 Marbled Murrelet critical habitat designation, as reaffirmed in 2008 and amended in 2011, and requiring FWS to adopt a revised designation by 2018. Intervening conservation groups opposed the Consent Decree, and the district court declined to approve it. ECF 50 at 30-53. Thereafter FWS abandoned the proposed Consent Decree, and instead filed a motion for voluntary remand of its critical habitat rule without vacatur, which AFRC opposed but the district court approved, ECF 68 at 15-27, requiring FWS to publish a revised critical habitat rule by 2016.

California.

On March 30, 2013, the district court issued a Memorandum Opinion upholding the "discreteness" determination, finding that AFRC had waived its "interbreeds when mature" claim by failing to raise it during the comment period on the delisting decision, finding nonetheless that the "interbreeds when mature" issue is imbedded in the "significance" determination required by the DPS Policy, finding that FWS had failed to make an "interbreeds when mature" finding in the Not Warranted Decision, and remanding the Not Warranted Decision to FWS "for the limited purpose of determining whether central California Marbled Murrelets 'interbreed when mature' with other Marbled Murrelets in the Washington, Oregon, and California DPS, and the impact of that determination on FWS's significance determination." ECF 51 at 2. The court granted summary judgment to FWS on the "discreteness" and "interbreeds when mature" claims, but did not rule on the "significance" claim. *Id*. at 1-2.[3]

On June 21, 2013 FWS submitted its Remand Memorandum to the district

_____

[3]FWS conducted the 2004 status review by comparing Canadian law against U.S. law with ESA protection for the Marbled Murrelet. The 2009 status review reversed that approach, comparing Canadian law against U.S. law without ESA protection for the Marbled Murrelet. AR 8401. AFRC challenged that reversal below, but the district court rejected the claim. ECF 50 at 24-25. AFRC does not pursue that claim in this appeal.

court finding that "the Murrelets in central California are interbreeding, albeit at low levels, with Murrelets from elsewhere within the DPS." ECF 58 at 3. Based on that finding, FWS reaffirmed the significance determination in the 2010 Not Warranted Decision: "Because the central California Murrelets 'interbreed when mature' with those to the north, the significance analysis in our January 10, 2010, 12-month finding ... remains valid." *Id*.

On September 5, 2013 the district court issued a Memorandum Opinion rejecting AFRC's challenge to the "significance" determination, and granting summary judgment to FWS. ECF 68 at 5-15. This appeal followed.

## <u>Argument</u>

I.    **FWS' ESA LISTING DECISIONS, PUBLISHED IN THE FEDERAL REGISTER AND WIDELY ACCORDED *CHEVRON* DEFERENCE, ARE PRECEDENTIAL AGENCY RULINGS FWS MUST EITHER FOLLOW OR PROVIDE A REASONED EXPLANATION FOR FAILING TO FOLLOW.**

In the proceedings below, FWS advocated that its ESA listing decisions, including the decision challenged in this case, are entitled to *Chevron* deference from the courts: "[T]he Service's interpretation [in the listing decision] is entitled to *Chevron* deference ... The Service's 12-month finding, as further explained on remand, has the force of law as it has binding legal effect on the agency and third

parties." ECF 62 at 6-7.

FWS has similarly sought and obtained *Chevron* deference for its ESA listing decisions in other cases throughout the country. In *In re Polar Bear Endangered Species Act Listing and 4(d) Rule Litigation*, 794 F.Supp.2d 65 (D. D.C. 2011), the district court found that FWS had misinterpreted an ESA term as unambiguous, and remanded the decision to the agency to develop a new interpretation based on the court's conclusion that the statute is ambiguous. On remand FWS affirmed its prior decision based on a new interpretation of the statute. FWS and every other party in the case save one agreed that FWS' interpretation of the ESA in a listing decision is entitled to *Chevron* deference. *Id*. at 88. Agreeing with FWS, the district court held that an FWS listing decision is entitled to *Chevron* deference, and upheld the agency interpretation under the deferential *Chevron* standard. *Id*. On appeal, the standard of review applicable to ESA listing decisions was not raised as an issue, and this Court affirmed the district court's decision without expressly addressing that question. *In re Polar Bear Endangered Species Act Listing and Section 4(d) Rule Litigation--MDL No. 1993*, 709 F.3d 1, 7-8 (D.C. Cir.), *cert. denied*, 134 S. Ct. 310 (2013).

In *Northern Cal. River Watch v. Wilcox*, 633 F.3d 766, 773 (9th Cir. 2010), the

Ninth Circuit agreed with FWS that its listing decisions are entitled to *Chevron*

deference:

> The United States asks us to defer to several purportedly relevant
> statements found in three rules that add plants to the endangered species
> list. We have previously determined that such rulings were promulgated
> by the FWS in the exercise of its delegated authority. ...Thus the second
> requirement under *Mead* for granting *Chevron* deference ... is also met.
> ... Therefore, we proceed to the second step of *Chevron*.

*Id*. at 777.  Various district courts have also held that ESA listing decisions are

entitled to *Chevron* deference. *Western Watersheds Proj. v. Ashe*, 948 F.Supp.2d

1166, 1184 (D. Id. 2013); *Def. of Wildlife v. Salazar*, 729 F.Supp.2d 1207, 1222 (D.

Mont. 2010); *Nat'l Wildlife Fed. v. Norton*, 386 F.Supp.2d 553, 565 (D. Vt. 2005);

*Sw. Ctr. for Biol. Diversity v. Babbitt*, 926 F.Supp. 920, 923-24 (D. Ariz. 1996); *also*

*see Ariz. Cattle Growers' Ass'n v. Kempthorne,* 534 F.Supp.2d 1013, 1029 (D. Ariz.

2008) (granting *Chevron* deference to FWS determination of critical habitat under 16

U.S.C. §1533).

In this case, AFRC accepts FWS' contention that an ESA listing decision is

entitled to *Chevron* deference because it has "the force of law" and "binding legal

effect on the agency." ECF 62 at 6-7.  AFRC challenges the FWS argument, asserted

repeatedly below, that <u>even though</u> FWS listing decisions have "the force of law" and

"binding legal effect on the agency," FWS listing decisions do <u>not</u> have precedential

effect, and FWS may freely depart from principles announced in previous listing decisions without acknowledging or explaining the departure.[4]

It is well-settled that "an agency changing its course ... is obligated to supply a reasoned analysis for the change. ... [R]easoned decision making ... necessarily requires the agency to acknowledge and provide an adequate explanation for its departure from established precedent, and an agency that neglects to do so acts arbitrarily and capriciously." *Jicarilla Apache Nation v. U.S. Dept. of Interior*, 613 F.3d 1112, 1120 (D.C. Cir. 2010) (citations and quotations omitted). "[T]he requirement that an agency provide reasoned explanation for its action would ordinarily demand that it display awareness that it is changing position. An agency may not, for example, depart from a prior policy *sub silentio* or simply disregard rules that are still on the books." *Fed. Comm'ns Comm. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).

In the proceedings below, AFRC argued that the rules, policies and principles FWS applied for determining the "significance" and "discreteness" factors of the DPS Policy for the Marbled Murrelet differ sharply from the standards FWS has consistently applied in its previous DPS determinations. ECF 33 at 21-25; ECF 41

---

[4]AFRC raised this issue below, ECF 33 at 21-25, but the district court did not choose to address the issue. *See, e.g.*, ECF 68 at 12-15.

at 24-25.  FWS responded with an unequivocal denial that its prior listing decisions constitute precedents that it must follow or provide a reasoned explanation for failing to do so:

1. "[T]hese [prior ESA listing decisions] are limited to their particular facts; they do not limit the Service's discretion in other cases ...."  ECF 38 at 30.

2. When AFRC cited specific prior contrary listing decisions, FWS responded: "The Service has disputed that these citations are relevant, since the Service makes its decisions on a case-by-case basis, and the Service has denied that the examples establish a policy or practice that the Service must follow."  ECF 43 at 12 (underlining added).

3. When AFRC pointed out a specific prior FWS listing decision that had articulated a different listing standard than FWS used in this case, FWS responded by asserting that the prior decision "was fact-specific and did not purport to establish a broader Service policy or position."  ECF 43 at 6.

The first issue in this appeal is whether FWS may refuse to give precedential effect to ESA listing decisions for which it has sought and obtained *Chevron* deference.  The answer under well-settled law is no.

Precedential effect – limiting agency discretion in future cases – is precisely

33

the characteristic that entitles federal agency action to *Chevron* deference. "The *Chevron* standard was developed in the context of precedential administrative decisions, where an agency's interpretation of a statute has the force of law." *River Street Donuts, LLC v. Napolitano*, 558 F.3d 111, 116 (1st Cir. 2009) (footnotes omitted). "[T]he essential factor in determining whether an agency action warrants *Chevron* deference is its precedential value." *Garcia-Quintero v. Gonzales*, 455 F.3d 1006, 1012 (9th Cir. 2006) (quotations omitted); *De Leon-Ochoa v. Attorney General of U.S.*, 622 F.3d 341, 350 (3rd Cir. 2010) (same, citing *Garcia-Quintero*). "[N]on-precedential opinions—which ... do not carry the force of law—are not analyzed under *Chevron*." *Arobelidze v. Holder*, 653 F.3d 513, 520-21 (7th Cir. 2011) (overruling contrary circuit precedent to join other circuits in holding non-precedential Board of Immigration Appeals decisions are not entitled to *Chevron* deference). An agency decision that "disclaims precedential effect ... is not entitled to deference under *Chevron*." *Nathel v. C.I.R.*, 615 F.3d 83, 93 (2d Cir. 2010). "[A] non-precedential decision ... is not entitled to *Chevron* deference*." Lockhart v. Napolitano*, 573 F.3d 251, 262 (6th Cir. 2009). "[T]he agency deserves *Chevron* deference only if it is acting with the force of law. ... The [agency] was not acting with the force of law in this case because it was ... not acting in a way that would

have precedential value for subsequent parties." *High Sierra Hikers Ass'n v. Blackwell*, 390 F.3d 630, 648 (9th Cir. 2004) (citations and quotations omitted).

Thus, ESA listing decisions widely held, at the urging of FWS, to be entitled to *Chevron* deference must have precedential effect on FWS. That precedential effect triggers the rule that "reasoned decision making ... necessarily requires the agency to acknowledge and provide an adequate explanation for its departure from established precedent, and an agency that neglects to do so acts arbitrarily and capriciously." *Jicarilla Apache Nation,* 613 F.3d at 1120.

Both of the district court cases that have addressed the APA obligation of the FWS to follow its prior ESA listing decisions or explain its reasons for failing to do so have held that FWS has this APA obligation. In *Def. of Wildlife*, 729 F.Supp.2d at 1222, the Court held that FWS listing decisions are entitled to *Chevron* deference, and held the FWS listing decision in that case arbitrary and capricious because FWS had failed to explain its departure from positions taken in past listing decisions. In *Sw. Ctr. for Biol. Diversity*, 926 F.Supp. at 923-24, the Court applied the *Chevron* framework to a challenge to an FWS listing decision, and rejected the decision because it conflicted with prior FWS listing decisions without acknowledgment or explanation. In addition, in *Nat'l Ass'n of Homebuilders*, 340 F.3d at 848, the court

evaluated the lawfulness of an FWS DPS listing decision by comparing the decision to earlier DPS decisions, giving those earlier decisions precedential effect, although without explicit reference to *Chevron*.

The issue is not, as FWS will no doubt argue, whether FWS is entitled to apply its listing policies individually in each case based on the facts in the record. Of course it is, as every federal agency applies its established policies individually in each case based on the facts in the record. The facts in every ESA listing decision are different, as are the facts in every Federal Communications Commission decision, every Social Security Administration decision, and every other federal agency decision. As the Court noted of FWS listing decisions in *In re Polar Bear*, because "[t]he term 'foreseeable' is not defined by statute or regulation. FWS determines what constitutes the 'foreseeable' future on a case-by-case basis in each listing decision." 709 F.3d at 15. What the APA requires – of FWS and every other federal agency – is that in considering the unique facts in each case, agencies that have adopted a relevant agency policy entitled to *Chevron* deference – a policy that, like an FWS listing decision, "has the force of law as it has binding legal effect on the agency and third parties," ECF 62 at 7 – must <u>follow</u> that policy or <u>explain its reasons</u> for failing to do so. *Jicarilla Apache Nation,* 613 F.3d at 1120.

In this case, FWS applied standards to the Murrelet DPS determination that contradict at least 20 of its earlier DPS precedents. FWS made no attempt to acknowledge or explain the reasons it departed from its legally-binding precedents, asserting that "the Service makes its decisions on a case-by-case basis, and the Service has denied that the examples establish a policy or practice that the Service must follow." ECF 62 at 12. This Court should reject FWS' contention and hold that FWS listing decisions, published in the Federal Register and accorded *Chevron* deference, do "establish a policy or practice that the Service must follow."

This issue of FWS accountability to the public goes to the heart of the relationship between a federal agency and the citizens who are affected by the decisions of the agency. Consistency and adherence to precedent allow citizens to be able to predict and anticipate how a federal agency will render decisions that affect them, and to adjust their affairs in anticipation of a likely decision. FWS denies citizens that basic right for its often-profound ESA regulatory decisions, such as listing a species as endangered or threatened. Citizens have no ability to predict how FWS will treat the facts of any particular listing case even if the facts appear similar or even identical to the facts of an earlier listing decision.

The absence of predictability or consistency of FWS decisions tempts citizens

to suspect that hidden or even improper motivations may influence FWS decisions – is the governor of an affected state in the same political party as the President? Does an affected industry have special influence in the executive branch of government? Is there a particular project or set of projects that will be shut down due to a listing, and if so, who wants to achieve that objective? These are the real-life suspicions that Americans harbor toward FWS – largely because FWS never explains why it makes inconsistent decisions in seemingly identical cases.

No better (or worse) example of FWS inconsistency exists than in the case of the Marbled Murrelet and its nearly identical cousin the Kittlitz's Murrelet, which occupies the very same ocean waters in Alaska. In 2013, less than four months after FWS reaffirmed its DPS determination for the Marbled Murrelet DPS, FWS made a DPS determination for the Kittlitz's Murrelet. *See* 78 Fed. Reg. 61775 (October 3, 2013). The major difference between the species is that there are no more than 41,000 Kittlitz's Murrelets in existence, compared to at least 650,000 Marbled Murrelets. Fed. Reg. 61777.

FWS found that like the Marbled Murrelet, the Kittlitz's Murrelet population has been stable since 2000, and the species is not threatened or endangered. Fed. Reg. 61777. Then FWS addressed whether a DPS of the species exists. The DPS

information for the Kittlitz's Murrelet in Russia appears as close as imaginable to that of the Marbled Murrelet in Washington, Oregon and California. "The Kittlitz's murrelet is broadly distributed across coastal Alaska and eastern Russia where it spends its entire annual cycle, but only less than 5 percent of the minimum global population of the Kittlitz's murrelet resides in Russian waters during the breeding season." 78 Fed. Reg. 61778. The international boundary "essentially bisect[s] the distribution of this species." *Id*. A Russian Kittlitz's Murrelet DPS would contain five percent of the species population and 50 percent of its range, compared to the Marbled Murrelet DPS containing two percent of the species population and 18 percent of "total coastal distribution."

Since FWS had based the Marbled Murrelet DPS decision on its review of international regulatory differences between the U.S. and Canada, it would seem reasonable to expect FWS to perform a similar review of the comparative international regulatory differences between the U.S. and Russia for its decision on the Russian Kittlitz's murrelet DPS. And if comparable regulatory differences were found, it would seem reasonable to expect FWS to designate the Russian Kittlitz's murrelet population as a DPS.

That is not how FWS works. For the Kittlitz's Murrelet, FWS performed no

comparison of U.S. and Russian law, and required just <u>half of one sentence</u> to decide that the Russian population is not a DPS: "we have no reason to conclude that differences in control of exploitation, management of the habitat, conservation status of the species, or regulatory mechanisms exist that are significant to the listing status of the Kittlitz's murrelet." *Id.* It is simply impossible to comprehend why FWS went to the extraordinary lengths in its Marbled Murrelet decision to justify a DPS based on international regulatory differences, but could not muster more than half a sentence's worth of effort to evaluate a similar DPS for the Kittlitz's Murrelet. Citizens trying to understand these two essentially contemporaneous decisions can be excused for wondering if the results were different in the two cases because FWS wanted the results to be different, not because actual differences exist.

In this case, as AFRC will demonstrate below, both the FWS significance finding and discreteness finding were contrary to principles and interpretations FWS has articulated and applied in at least 20 of its prior DPS decisions, and FWS failed to either acknowledge or explain these departures. AFRC suggests that this Court has the <u>power</u>, and the <u>duty</u>, to require FWS to do what every other federal agency must do: follow its legally-binding decisions that are entitled to *Chevron* deference, or explain the reasons it fails to do so. Its disregard of that duty in this case was

arbitrary and capricious.

## II. THE FWS "SIGNIFICANCE" DETERMINATION IMPERMISSIBLY DEPARTED WITHOUT EXPLANATION FROM 13 OF FWS' LEGALLY BINDING PRECEDENTS, LACKED A RATIONAL BASIS, AND WAS ARBITRARY AND CAPRICIOUS

FWS determined that "[t]he [Washington-Oregon-California] United States population of Murrelets is ... significant ... as the loss of this distinct population segment would result in a significant gap in the range of the taxon and the loss of unique genetic characteristics that are significant to the taxon."  AR 0007.  FWS relied on the second factor identified in the DPS Policy  – "loss of the discrete population segment would result in a significant gap in the range of a taxon" – and presumably also relied on the fourth factor –"the discrete population segment differs markedly from other populations of the species in its genetic characteristics" – although FWS never found the Murrelet population "differs markedly from other populations of the species in its genetic characteristics."

AFRC will show that both the "significant gap" determination and the "loss of unique genetic characteristics" determination are unlawful; but even if just one of the determinations is arbitrary and capricious, the decision must be vacated because "where [an agency] has relied on multiple rationales (and has not done so in the alternative), and we conclude that at least one of the rationales is deficient, we will

41

ordinarily vacate the order unless we are certain that [the agency] would have adopted it even absent the flawed rationale." *Nat. Fuel Gas Supply Corp. v. Fed. Energy Reg. Comm.*, 468 F.3d 831, 839 (D.C. Cir. 2006).

## A.    The "significant gap" determination was arbitrary and capricious.

FWS offered just one paragraph to support its conclusion that the loss of the DPS would create a "significant gap" in the range of the Murrelet taxon:

> This gap is significant because the Washington, Oregon, and California area accounts for roughly 18 percent of the total coastal distribution of the species, encompassing 17 degrees of latitude.  In addition, the Washington, Oregon, and California area is located at the southern-most extent of the range.  This DPS contains an ecologically distinct forest system, the coastal redwood zone. Moreover, peripheral and disjunct populations may play an important role in maintaining opportunities for speciation and future biodiversity ....  Recovery of species without the conservation of these peripheral populations may be impossible if these populations are eliminated or severely damaged ....

AR 0007 (citations omitted); *see* ECF 68 at 6.

## 1.    All three findings supporting the "significant gap" determination contradict binding FWS precedents, without acknowledgment or explanation.

All three of the factors cited by FWS to support its "significant gap" determination -- the population is "peripheral," the DPS occupies 18 percent of "total coastal distribution," and the DPS contains an "ecologically distinct" area -- contradict, without acknowledgment or explanation, previous DPS decisions holding

that each of these factors is <u>insufficient</u> to justify DPS status:

**1.     <u>Peripheral population.</u>**

 "Within the distribution of every species there exists a peripheral population, an isolate or subpopulation of a species at the edge of the taxon's range."  68 Fed. Reg. 34628 (June 10, 2003); 71 Fed. Reg. 26009 (May 3, 2006); 71 Fed. Reg. 56228 (September 26, 2006).  In no fewer than <u>eight</u> DPS determinations before the Murrelet decision – four before the original 2010 decision, one of which was upheld by the Ninth Circuit, and four more before FWS reaffirmed the 2010 decision in 2013[5] – FWS had ruled that the mere fact a population is peripheral is <u>not</u> a sufficient basis for finding that its loss would create a significant gap.  In all eight decisions FWS found that a peripheral population could be designated as a DPS only if the <u>members of the peripheral population</u> have "develop[ed] distinctive morphological, behavioral, or genetic characteristics through adaptation to local conditions." *Nw. Ecosystem Alliance*, 475 F.3d at 1147.  In all eight cases, FWS decided that a peripheral population of a species proposed for listing was <u>not</u> significant under the DPS Policy because the members of the population had <u>not</u> developed biological

---

[5]The district court observed that in June 2013 "FWS reaffirmed its determination that the tri-state population of the Murrelet is sufficiently significant to warrant listing as a DPS."  ECF 68 at 6.

distinctiveness:

i.  The earliest precedent is a 2003 decision that the loss of a population of the Western Gray Squirrel at its northern periphery would not create a "significant gap" under the DPS Policy.  68 Fed. Reg. 34636 (June 10, 2003).  FWS applied a policy that while the loss of a peripheral population <u>could</u> create a "significant gap" for a taxon, <u>not every</u> peripheral population is necessarily significant.  68 Fed. Reg. 34539. In that case FWS found that the peripheral population of the Western Gray Squirrel was <u>not</u> significant.  *Id*.  The Ninth Circuit upheld that FWS decision:

> At the outset, the Service noted that Washington gray squirrels constitute an isolated, <u>peripheral population</u> at the northern portion of the subspecies' range. ...  The Service ... believed that any gap caused by the loss of the Washington population would not be significant because the <u>population lacks biologically distinctive traits</u>.

*Nw. Ecosystem Alliance*, 475 F.3d at 1147 (underlining added).

ii.  In its 2006 Cactus Ferruginous Pygmy Owl DPS delisting decision, FWS ruled that the peripheral nature of a population does not alone make it significant. "Peripheral populations ... <u>may</u> be significant to the taxon as a whole through contributions to genetic variability, environmental adaptation, and supplying emigrants to other populations."  71 Fed. Reg. 19454, 19457 (April 14, 2006) (underlining added).  Again, FWS found that the loss of the peripheral population in

question would not constitute a significant gap for the taxon as a whole.

    iii.  In a 2006 decision not to list a DPS of Roundtail Chub in the lower Colorado River basin, FWS again ruled that the loss of peripheral populations can be significant only if there is "[e]vidence of changes in these populations [which] may include genetic, behavioral, and/or morphological differences from populations in the rest of the species' range."  71 Fed. Reg. 26009.  The peripheral population in that case was not significant because it had no "biologically or ecologically significant" genetic characteristics and no "morphological and behavioral differences."  *Id*.

    iv.  In 2006 FWS similarly determined the peripheral U.S. population of the Northern Mexican Gartersnake does not meet the significance test in the DPS Policy because there was no "[e]vidence of ... genetic, behavioral, and/or morphological differences from populations in the rest of the species' range."  71 Fed. Reg. 56228, 56233 (September 26, 2006).

    v.  In 2010, FWS determined that peripheral populations of the American Pika were not significant under the DPS Policy because the "loss of the pika occurrence would not result in a gap that is biologically significant for [the] subspecies."  75 Fed. Reg. 6467 (February 9, 2010).

    vi.  In 2010 FWS determined that a proposed Sonoran Desert DPS of the

American Bald Eagle was not significant under the DPS Policy because "loss of eagles in the Sonoran Desert Area would not represent a significant gap in the range of the species due to a loss of biologically distinctive traits or adaptations, or genetic variability of the taxon." 75 Fed. Reg. 8619 (February 25, 2010).

> vii.  In 2010 FWS found that a peripheral U.S. population of the White-Sided Jackrabbit, which is far more plentiful in Mexico, is not significant under the DPS Policy:

> > While populations which are on the edge or periphery of a species' range <u>sometimes</u> have unique characteristics which may benefit the survival of a species as a whole, or while such areas <u>may</u> play an important life-history role for a species (such as outlying populations composed of juvenile, nonbreeding animals), <u>there is no information that indicates this is the case with the jackrabbit.</u>

75 Fed. Reg. 53628 (September 1, 2010) (underlining added).

> viii.   Most recently, in 2011 FWS determined that the loss of a peripheral population of the Amargosa River Mojave Fringed-Toed Lizard would not create a significant gap for the taxon as a whole because "available evidence does not indicate that individuals from the Amargosa River population have unique morphological, behavioral, or physiological adaptations that may be significant to the species' conservation."  76 Fed. Reg. 61327 (October 4, 2011).

All eight of these decisions applied the same articulated policy:  the loss of a

peripheral population does not create a "significant gap" under the DPS Policy unless the population displays "distinctive morphological, behavioral, or genetic characteristics" that are different from other populations of the species.  Yet in the Murrelet decision in this case, FWS ignored these eight precedents, without acknowledgment or explanation, and ruled that the mere fact the Murrelet DPS is peripheral, without finding the population has "distinctive morphological, behavioral, or genetic characteristics" from other Murrelet populations, supports a DPS determination.  This disregard of agency precedent was arbitrary and capricious.

**2.      18 percent of "total coastal distribution."**

FWS' second reason for finding a significant gap – that the DPS "accounts for roughly 18 percent of the total coastal distribution of the species" – contradicts existing judicial and agency precedent holding that "finding a gap significant based on the curtailment of a taxon's current range requires the loss of a geographic area that amounts to a substantial reduction of a taxon's range."  *Nat'l Assoc. of Homebuilders*, 340 F.3d at 848 (underlining added).  FWS subsequently adopted this "substantial reduction" test.  71 Fed. Reg. 19457 (April 14, 2006).  Yet in this case FWS never found the potential loss of 18 percent of total coastal distribution would be a "substantial reduction" of the Murrelet's range.

47

FWS conceded below that it never made a "substantial reduction in range" finding, and tried to fall back on the doctrine that a reviewing court can "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974). But nothing in the record of this case shows an agency path that can "reasonably be discerned" because nothing in the record shows the Murrelet DPS occupies a "substantial" portion of the Murrelet's range.

FWS never stated what percentage of the "range" is occupied by the Murrelet DPS. Instead, FWS employed a different metric – "percent of the total coastal distribution of the species" – without ever defining "total coastal distribution," or explaining its meaning, or relating the phrase to the species' "range." Presumably, FWS used "total coastal distribution" to mean something <u>other than</u> "range," or else FWS would have used the word "range."

FWS counsel argued below, apparently assuming that "total coastal distribution" is a synonym for "range," that "18% is not a de minimus or small amount, and is substantially higher than the five percent the Service found was not significant in the *NAHB* case." ECF 38 at 28. Even if that *post hoc* statement from counsel were true (which depends on the unknown meaning of "total coastal

distribution"), the "*post hoc* salvage operations of counsel cannot overcome the inadequacy of the [agency's] explanation." *KeySpan-Ravenswood, LLC v. Fed. Energy Reg. Comm*., 348 F.3d 1053, 1059 (D.C. Cir. 2003).

In the recent Northern Mexican Gartersnake case FWS found that a "20–30 percent" range reduction for a species was not substantial or significant, 71 Fed. Reg. 56233, and for the Cactus Ferruginous Pygmy Owl found that a 12% historical range reduction (5% of current range) was not substantial or significant.  71 Fed.Reg. 19457.  The Court can not infer that an 18 percent reduction in "total coastal distribution" (whatever that means) will on every occasion be "substantial."  Thus, the Court can not uphold the "significant gap" finding without a reasoned determination by FWS showing why <u>in this case</u> "18 percent of the total coastal distribution of the species" is a substantial part of the Murrelet taxon's range.

FWS' counsel also argued below that <u>if FWS had found</u> "18 percent of the total coastal distribution of the species" to be a significant part of the Murrelet taxon's range, such a finding would be "consistent with the listing decisions the Ninth Circuit held out as appropriately finding a gap significant because it amounted to a substantial reduction in the taxon's range." ECF 38 at 28.  Apart from the impermissibility of *post hoc* argument of counsel, *KeySpan-Ravenswood, LLC*, 348

F.3d at 1059, FWS should not be allowed to rely on past decisions while at the same time denying the precedential effect of those past decisions.

**3.    Ecologically distinct area.**

FWS' third basis for the significant gap finding was that the DPS includes "an ecologically distinct forest system, the coastal redwood zone."  This ground also contradicts the established FWS position on that issue, as articulated in four prior decisions.  The FWS 2003 policy on ecologically distinct areas is the same as the policy on peripheral populations set in the Western Gray Squirrel case:  "ecological distinctiveness" of habitat can not make a DPS significant unless the organisms that occupy that habitat also have a "biological distinctiveness." This policy was upheld in *Nw. Ecosystem Alliance*, 475 F.3d 1136.  FWS applied this policy to three later listing decisions:

i.  In the FWS 2010 decision not to list the Sonoran Bald Eagle DPS, the agency found the presence of an ecologically distinct area of habitat did not justify a DPS determination, explaining:

> The mere fact that a species persists in an ecological setting that differs to some degree from other ecological settings in which it is found does not mandate a finding that a population is significant to the taxon to which it belongs. Here, we find that the species' persistence in the Sonoran Desert Area is not significant to the taxon as a whole because these particular eagles exhibit similar behavior and nesting adaptations

to their setting as do bald eagles in other settings.

 75 Fed. Reg. 8619 (underlining added).

    ii.  Also in 2010, FWS ruled that a DPS of Mountain Whitefish in Idaho was not significant because "[w]e have no information indicating that ... the whitefish occurring therein are biologically or ecologically significant to the species as a whole." 75 Fed. Reg. 17359 (April 6, 2010).

    iii.  In 2011 FWS rejected DPS status for a petitioned Sonoran Desert Cactus Ferruginous Pygmy Owl population because while the DPS "does differ ecologically from the remainder of the areas within its range ..., the best available scientific and commercial data do not indicate that this ecological difference has resulted in any morphological, physiological, or genetic differentiation within pygmy owl populations in the Sonoran Desert."  76 Fed. Reg. 61886 (October 5, 2011).

    The Murrelet decision contradicts all four of these precedents by holding that the ecological distinctiveness of the habitat in the redwood zone, by itself, is sufficient to create a significant gap even though the Murrelets in the redwood zone – as in the Western Gray Squirrel, Bald Eagle, Mountain Whitefish and Pygmy Owl cases – do not have any "morphological, physiological, or genetic differentiation," 76 Fed. Reg. 61886, compared to other Marbled Murrelets.  The district court also

found this justification lacking, concluding that "the mere presence of an ecologically distinct forest system would be insufficient, on its own, to support FWS's significance finding."  ECF 50 at 19 n. 3.

**4.    Conclusion:  FWS failed to follow its existing precedents on all three factors cited for its "significant gap" finding, and failed to justify its course reversal or its "significant gap" conclusion.  Combining the three flawed reasons into a single decision does not make any of them lawful.**

FWS will no doubt argue here, as it did below, that the agency did not rely "alone" on any single one of its three cited factors, but instead relied on all of them together.  ECF 38 at 32.  This is fallacious logic. When an agency relies on multiple grounds for a decision, and the court finds that some of the grounds are invalid, the Court may sustain the decision only if "one [ground] is valid and the agency would clearly have acted on that ground even if the other were unavailable."  *Casino Airlines, Inc. v. National Transp. Safety Bd.*, 439 F.3d 715, 717 (D.C. Cir. 2006). Combining three unlawful justifications does not give any of them more legal validity than if each stood on its own.

**B.    The FWS finding that the loss of the DPS would result in the loss of "unique genetic characteristics that are significant to the taxon" did not match any DPS Policy criterion, and was arbitrary and capricious.**

While FWS never found that the DPS "differs markedly from other populations of the species in its genetic characteristics," as required in the fourth significance

factor in the DPS Policy, genetic issues are <u>only</u> relevant to the fourth significance

factor, and FWS' assertion that the DPS contains "unique genetic characteristics that

are significant to the taxon" must implicitly rely on the fourth factor.  FWS explained

its consideration of genetic issues as follows:

> [Researchers] ... concluded that Murrelets appear to comprise three genetic units: (1) Western and central Aleutian Islands; (2) eastern Aleutian Islands to northern California; and, (3) central California. Loss of any of these populations would result in the loss of a portion of the species' genetic resources and/or local adaptations, and may compromise its long-term viability .... Since the currently listed population encompasses all of one genetic unit as mentioned above and a portion of another, loss of the population could compromise the long-term viability of the species as a whole.

AR 0007.  FWS relied solely on genetic variation in the small central California

population of Murrelets, totaling 100-300 birds in 2008, AR 2611, which is just one

percent of the DPS and two-one thousandths of the total species population.  In its

Remand Memorandum, ECF 58, FWS found "very little gene flow continues to occur

... between northern and central California."  *Id.* at 3. FWS admits the remaining 99

percent of the Marbled Murrelets in the DPS are genetically indistinguishable from

the Marbled Murrelets in Canada and most of Alaska.  AR 0007.  These facts would

not permit FWS to find the entire DPS "differs markedly" from other Marbled

Murrelets.  Thus, it appears no coincidence that FWS never found the DPS "differs

markedly"from other Marbled Murrelets in its genetic characteristics. FWS' reliance on a genetic factor not present in the DPS Policy was arbitrary and capricious.

## III.  THE FWS "DISCRETENESS" DETERMINATION CONFLICTS WITHOUT EXPLANATION WITH FIVE PRIOR CONTRARY PRECEDENTS, LACKED A RATIONAL BASIS, AND WAS ARBITRARY AND CAPRICIOUS

The DPS Policy allows an international boundary to define a DPS only when "differences in control of exploitation, management of habitat, conservation status, or regulatory mechanisms exist [between the two countries] that are significant in light of section 4(a)(1)(D) of the [ESA]."  The words in section 4(a)(1)(D) of the ESA, 16 U.S.C. §1533(a)(1)(D), are "the inadequacy of existing regulatory mechanisms."  Thus, any international differences in "control of exploitation, management of habitat, [or] conservation status" are relevant to the DPS determination only insofar as they relate to "the inadequacy of existing regulatory mechanisms."

While FWS asserted that the "conservation status" of the Marbled Murrelet is different between the U.S. and Canada in that there are fewer Murrelets, less Murrelet habitat and greater past proportional loss of Murrelet habitat in Washington, Oregon and California than in Canada (inexplicably overlooking the million Murrelets in Alaska), AR 0003-04, FWS never connected these facts with any "inadequacy of

54

existing regulatory mechanisms," and thus never made the case that these facts are relevant to the DPS decision.

FWS did find that "[c]ompared with protection in Canada, there would be significantly less regulatory protection for the Murrelet in Washington, Oregon, and California if the species were not listed." AR 0004. The FWS identified just three grounds for this conclusion: 1) Canadian law prohibits incidental killing of Murrelets by fishermen while U.S. law in Washington state does not; 2) Canadian law protects Murrelets and Murrelet nest sites significantly better than U.S. law; and 3) the maximum fines are higher and the maximum jail terms are longer for hurting or killing Murrelets in Canada than the maximum U.S. fines and penalties under U.S. law. AR 0005. FWS conceded below that the first point is incorrect, and AFRC will show that the second and third rationales are legally insufficient to support this finding.

**A. The district court found FWS conceded its first stated regulatory difference - incidental killing of Murrelets by fishermen - is incorrect, but failed to vacate and remand as this Court's precedent requires.**

The Not Warranted Decision asserted that Canadian law prohibiting incidental ("bycatch") killing of Murrelets at sea by fishermen is superior to applicable federal and state laws in Washington State because "[w]ithout the ESA, Murrelets in

Washington do not appear to be protected from bycatch." AR 0006. However, AFRC showed below that FWS was mistaken in this assertion because the Migratory Bird Treaty Act prohibits any "take, capture, [or] kill" of a Murrelet anywhere in the U.S., including "take, capture, [or] kill" by fishermen through incidental "bycatch." ECF 33 at 38-39. The district court found that FWS conceded that issue by failing to respond to this argument, but declined to set the decision aside on that ground: "As FWS does not respond to this argument, the Court will not assume that delisting would result in a difference in bycatch protections across the border. That FWS may have misstated this minor difference does not render its overall conclusion arbitrary and capricious, however." ECF 50 at 27.

The district court's decision on this point was contrary to this Court's precedent in *Nat. Fuel Gas Supply Corp.*, 468 F.3d at 839, holding that "where [an agency] has relied on multiple rationales (and has not done so in the alternative), and we conclude that at least one of the rationales is deficient, we will ordinarily vacate the order unless we are certain that [the agency] would have adopted it even absent the flawed rationale." The rationales offered by FWS for its discreteness determination were not presented in the alternative, and a Court has no way of knowing whether FWS would have made the same decision without the bycatch

factor.  That legal flaw alone requires vacatur and remand.

**B.    FWS' finding that Canadian law protects the Marbled Murrelet and Marbled Murrelet habitat significantly better than U.S. law misinterpreted Canadian law, overlooked key measures of the Migratory Bird Treaty Act, disregarded other U.S. statutes, contrary to three prior precedents, ignored the practical insignificance of the Canadian statutory measures, contrary to two prior precedents, and improperly discounted the most important U.S. "existing regulatory mechanism" because it could be changed in the future.**

FWS' second stated international regulatory difference between Canadian law and U.S. law, AR 0005, was its conclusion that the Canadian Species at Risk Act (SARA) protects Murrelets and Murrelet habitat significantly better than the Migratory Bird Treaty Act, which protects the Marbled Murrelet because it is named as migratory under 50 C.F.R. § 10.13.

**1.    FWS misinterpreted Canadian law, and overlooked the plain language of the Migratory Bird Treaty Act, in its finding that section 32 of the Canadian Species At Risk Act protects the Marbled Murrelet significantly better than the MBTA.**

FWS relied on section 32 of SARA to conclude that SARA protects Marbled Murrelets better than the MBTA.  Its central conclusion was that "the MBTA's definition of 'take' ... does not include harm through habitat destruction, nor harassment. ... SARA, by contrast, protects the Murrelet from not only direct killing, but also from harm [and] harassment ...."  AR 0005.  This conclusion was based on

57

a clear misinterpretation of Canadian law, and disregarded the plain language of the MBTA.

Section 32 of SARA prohibits "kill, harm, harass, capture, or take" of a Marbled Murrelet.  AR 0005. The MBTA prohibits "pursue, hunt, take, capture, kill" of a Marbled Murrelet.  From these two sets of words, FWS only noticed that the Canadian list includes the words "harm" and "harass" while the U.S. list does not. AR 0005.

FWS apparently did not notice the U.S. list also contains two words the Canadian list does not:  "pursue" and "hunt."  A natural reading of "pursue" and "hunt" in the MBTA is broader than "harm" or "harass" in SARA, in that pursuing or hunting a Murrelet are a crime in the U.S. <u>whether or not</u> the target bird suffers any "harm" or "harassment" from the pursuing or hunting.  The MBTA list of prohibited acts thus appears stronger, rather than weaker, than the list in section 32 of SARA. In comparing the two statutes, the FWS' "determination of Canadian law is entitled to no deference from this court. ...  This is purely a question of law and the court is free to make its own independent determination of Canadian law." *Railway Labor Executives' Ass'n v. U.S. R.R. Retirement Bd.*, 749 F.2d 856, 860 (D.C. Cir. 1984) (citation omitted).

58

**2.      FWS' conclusion that section 33 of SARA protects Murrelet habitat significantly better than U.S. law was impermissibly based solely on a comparison of the text of the competing statutes, contradicting two prior precedents that disregarded textual differences in favor of examining practical differences between competing statutes.**

FWS contends that section 33 of SARA protects Murrelet <u>habitat</u> significantly better than U.S. law through language which "prohibits any person from damaging or destroying the residence of a listed species."  AR 0004.  FWS described SARA's textual protections for Murrelets:

> ... SARA protects Murrelets from harm and destruction of their residences, not only on Federal lands, but also on provincial and private lands, where most of the remaining habitat for the species occurs. ... SARA defines the ''residence'' of a species to mean ''a dwelling-place, such as a den, nest or other similar area or place, that is occupied or habitually occupied by one or more individuals during all or part of their life cycles, including breeding, rearing, staging, wintering, feeding or hibernating'' (S.C. ch. 29, § 2). Hence, to receive SARA's protection, a ''residence'' need not be continuously occupied by the species.

AR 0004.  In its comparison of laws, FWS never looked beyond the words of the Canadian statute to evaluate whether the words of the statute had any significant practical effect.

FWS' decision to limit its review of SARA section 33 to the text of the statute contradicts two prior precedents, one by FWS and one by NMFS, holding that the international law comparison for a DPS decision should not be based on textual

59

differences between international regulatory regimes, but instead should be based on practical differences between the two regimes:

i.  In the 2006 listing decision that the U.S.-Mexico boundary should not be used to justify a DPS of the Northern Mexican Gartersnake, FWS refused to compare the text of U.S. and Mexican laws because "any conclusions that may be drawn with reference to differences in management across the United States-Mexico border are largely speculative due to the lack of information available as to the <u>efficacy and protections of these regulations in practice</u>." 71 Fed. Reg. 56233 (underlining added).

ii.  In 2008 NMFS used the same approach to decline to create an international-boundary-based DPS between Russia and the U.S. for the Ribbon Seal where the two countries' statutes on paper were clearly unbalanced.  The U.S. barred all harvest of the Ribbon Seal while Russia "allow[s] large harvests (~18,000 annually)," yet NMFS held the differences to be insignificant in practice since "the actual takes [in Russia] are low because of poor economic viability." 73 Fed. Reg. 79827 (December 30, 2008).[6]  NMFS' decision not to create a Ribbon Seal DPS based on the absence of practical regulatory differences between the U.S. and Russia was upheld in *Center for Biol. Diversity v. Lubchenco*, 758 F.Supp.2d 945, 962 (N.D. Cal. 2010) (NMFS

---

[6]FWS has cited to NMFS precedents to support its decision, ECF 43 at 6, and may not dispute the relevance of NMFS DPS decisions.

"did not act arbitrarily or capriciously in concluding that although Russia has a different regulatory mechanism in place regarding commercial harvest of the ribbon seal, the actual threat to the ribbon seal is low.").

In this case, FWS ignored these precedents. Unlike the Northern Mexican Gartersnake case, FWS refused to consider the "efficacy and protections of [Canadian laws] in practice," and, unlike the Ribbon Seal case, blinded itself to the "actual" effect of Canadian law on Murrelets by refusing to consider that the life history of the sea-based, secretive Marbled Murrelet (explained below) renders SARA's "on paper" protection for Murrelet nests virtually meaningless. FWS neither acknowledged nor explained its departure from these two precedents.

3.    **Section 33 of SARA protects only 123 Murrelet nest trees out of the millions of available Murrelet nest trees in the entire country of Canada, making the practical impact of the textual protection insignificant.**

Marbled Murrelets are ocean birds that "remain at sea most of their lives." AR 5887. In Canada, Murrelet nests are found 55 to 135 feet (18-44 meters) above the ground. AR 6019. As a result of these factors, Murrelet nests are extraordinarily difficult for humans to find. FWS has acknowledged "the low number of observed nest sites" in Canada. AR 5885. While the current estimated Canadian population Marbled Murrelets is 54,300 to 92,600 birds, as of 2004 (the latest date for which the

61

Administrative Record contains an estimate) only <u>123</u> Murrelet nest sites have <u>ever</u> been located in all of Canada.  AR 6020-21.

Since SARA §33 only protects a nest tree that is "occupied or habitually occupied" by a Murrelet, the Canadian law offers no protection to a <u>potential</u> Murrelet nest tree that is not already "occupied or habitually occupied."  Thus, out of the millions of trees in Canada that are available to Marbled Murrelets as nest trees, only the 123 previously-located Canadian nest trees are protected by the Canadian law (and only if they all remain "occupied").

Protecting that tiny group of 123 known nests has particularly little conservation value for the Marbled Murrelet because, as scientists recognize, Murrelets normally do not use the same exact nest tree more than once:  "Nest sites of Marbled Murrelets often go unused in consecutive years, possibly as a way of reducing the likelihood of detection by predators .... "  AR 6767.  Yet scientists have also observed "a high degree of fidelity to a given <u>locality</u> by nesting Murrelets in different years." *Id*.  Thus, in a locality previously occupied by a Murrelet, to which a Murrelet is likely to return, the Canadian law <u>only</u> prohibits cutting down the one tree in a locality that a returning Murrelet is <u>not likely</u> to use (a former year's nest tree), while <u>failing</u> to protect every other tree in the locality.

For these reasons, in actual practice SARA § 33 offers no meaningful protection for Murrelet nest trees or any other Murrelet habitat. Just as the authorized harvest of 18,000 ribbon seals in Russia was rendered meaningless for a DPS decision by the actual circumstances, the theoretical habitat protection provided by SARA § 33 is rendered meaningless for Marbled Murrelets by the actual circumstances. FWS' failure to recognize or consider this factor was arbitrary and capricious.

**4.    FWS ignored two prior precedents by disregarding major U.S. statutes upon which it had previously relied, and the district court erred by assuming FWS had considered the statutes because they were cited in a document in the record.**

In finding that Canadian law protects Murrelets significantly better than U.S. law, FWS disregarded, without explanation, three of its prior precedents that had held other U.S. statutes to be important to a comparison of foreign and U.S. law under the DPS Policy: the National Forest Management Act (NFMA), 16 U.S.C. §§1600 *et seq.*, the Federal Land Policy and Management Act (FLPMA), 43 U.S.C. §§ 1701 *et seq.* and the ESA as applied to other listed species. FWS ignored all three of these laws in this case.

i. In a recent decision initiating a review on a Pacific Northwest DPS of the Fisher, FWS found that the NFMA made U.S. law stronger than Canadian law because Canada has no comparable federal land management law and since "[a]

63

substantial portion of the occupied fisher habitat in Montana and Idaho is managed under the NFMA[, i]f anything, fishers would have more protection in the United States due to the NFMA." 75 Fed. Reg. 19929 (April 16, 2010).

ii. FWS found in its recent boundary discreteness decision on the Flat-Tailed Horned Lizard that the boundary between the U.S. and Mexico did not define a DPS, even though the lizard is listed as a threatened species in Mexico, because "FLPMA is an adequate regulatory mechanism within the confines of its applicability." 76 Fed. Reg. 14234 (March 15, 2011).

iii. In the same Flat-Tailed Horned Lizard boundary discreteness decision, FWS also relied on incidental conservation benefits provided by the ESA listing of other species occupying the same area as the Lizard to determine that the international boundary could not properly define a DPS. 76 Fed. Reg. 14233.

But in its decision denying AFRC's delisting petition, FWS failed to consider the protective elements of NFMA, FLPMA and the ESA as applied to other species (*e.g.*, Northern Spotted Owl). FWS also failed to explain why these laws are not relevant for the Marbled Murrelet although FWS had found these laws relevant for other species facing similar international boundary issues.

The district court agreed that "FWS did not explicitly discuss these measures

64

in the 'not warranted' decision." ECF 50 at 28. The district court, however, was willing to overlook the omission because the statutes had been cited in the discussion of existing regulatory mechanisms in the advisory 2009 five-year status review, AR 2693, and "[t]hus, it appears that these statutes were considered." *Id*.

The district court's decision to ignore this failure was error because, axiomatically, "whatever the merits of [the agency's] position, we cannot consider it [if] the [agency] did not set it forth below." *LePage's 2000, Inc. v. Postal Regulatory Com'n*, 642 F.3d 225, 232 (D.C. Cir. 2011). "Even if the evidence in the record, combined with the reviewing court's understanding of the law, is enough to support the order, the court may not uphold the order unless it is sustainable on the agency's findings and for the reasons stated by the agency." *W.R. Grace & Co. v. Env'l Prot. Agency*, 261 F.3d 330, 338 (3rd Cir. 2001) (citations and quotations omitted). The fact that information about these three U.S. laws is in the record does not mean FWS considered that information in its Not Warranted Decision; to the contrary, it means its failure to consider that information in its decision is inexcusable.

**5.     FWS arbitrarily and capriciously failed to consider the most important U.S. "existing regulatory mechanism," the Northwest Forest Plan, because it could be changed in the future.**

The Northwest Forest Plan, adopted jointly by the Secretaries of Agriculture

and Interior in 1994 under NFMA, FLPMA and other resource laws, protects millions of acres of Marbled Murrelet habitat on federal forestlands managed by the U.S. Forest Service and the Bureau of Land Management (BLM) in Washington, Oregon and California. *See Seattle Audubon Soc'y v. Lyons*, 871 F.Supp. 1291, 1305 (W.D. Wash.1994) ("A band extending from ten miles to forty miles inland in California, Oregon, and Washington, is designated as a marbled murrelet zone with additional guidelines to protect the bird's habitat."), *aff'd, Seattle Audubon Soc'y v. Moseley*, 80 F.3d 1401 (9th Cir. 1996). FWS acknowledged that "[t]he adoption of the Northwest Forest Plan (NWFP) by the ... Forest Service and the ... BLM has greatly reduced the annual rate of [Murrelet] habitat loss on Federal land in the United States since 1994." AR 0006. However, FWS dismissed the relevance of the NWFP as an "existing regulatory mechanism" because "[i]f the Murrelet were delisted, the NWFP <u>could be amended</u> to reduce protection for the species," *id.*, admitting only that after such a hypothetical future amendment, the NWFP might continue to provide Murrelets "some incidental benefit." *Id*.

FWS thus used a potential future change to an existing regulatory mechanism to devalue the existing mechanism. This approach contradicts the command of the ESA, and the DPS Policy, to consider "existing regulatory mechanisms," 16 U.S.C.

§1533(a)(1)(d), and departs from the established FWS-NMFS approach, upheld in *Lubchenco*, 758 F.Supp.2d at 926, that "[w]e base our listing decisions on the status of the species at [the current] time, not on some time in the future." FWS' unexplained decision to disregard the words of the ESA and existing agency precedent was arbitrary and capricious.

## C.     FWS did not find that the lower U.S. criminal penalties under MBTA are "significant in light of" existing regulatory mechanisms.

FWS' final stated difference between Canadian law and U.S. law is that "MBTA's sanctions for violations are significantly lighter than SARA's, imposing only misdemeanor penalties of 6 months imprisonment and $15,000 in fines (16 U.S.C. 707), compared with the felony-level sanctions under SARA," AR 0005, which are "a fine of up to $250,000 for an individual, or $1,000,000 for a corporation, or imprisonment for up to 5 years, or both." AR 0004. Those textual differences exist, but as with the habitat protection laws, FWS never looked beyond the text to determine if there is any practical difference between the statutes. To support a boundary discreteness decision, an international regulatory difference must be "significant in light of" existing regulatory mechanisms. FWS never made such a finding for the criminal penalty laws, and the Administrative Record contains not a single word about differing criminal penalties between Canadian and U.S. law, let

alone any explication of significance of those differing penalties.  FWS' unsupported and unexplained reliance on mere textual difference in penalties, without a finding of significance, is arbitrary and capricious.

## Conclusion

The judgment of the district court should be reversed, and the case should be remanded to the district court with instructions to enter judgment for AFRC on its First, Second and Third Claims.

Dated this 14th day of May, 2014.

MARK C. RUTZICK, INC.

By:___/s/ Mark C. Rutzick_____
        Mark C. Rutzick
        Attorney for Plaintiffs-Appellants

68

**Statement of Compliance with Fed.R.App.P.  32 (a)(7)(C)**

I certify that pursuant to Fed. R. App. P. 32 (a)(7)(C) and Circuit Rule 32, the attached brief is proportionally spaced, has a typeface of 14 points, and contains 12,656 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

_____/s/ Mark C. Rutzick_____
Mark C. Rutzick

**Certificate of Service**

I certify that on May 14, 2014 I served the PLAINTIFFS-APPELLANTS' OPENING BRIEF on the following counsel of record by electronic filing in accordance with the Court's ECF/CM system:

Nina C. Robertson
U.S. Department of Justice
Environment and Natural Resources Division, Appellate Section
P.O. Box 23795, L'Enfant Station
Washington, D.C.  20026-3795

Patti A. Goldman
Kristen L. Boyles
Earthjustice
705 Second Avenue, Suite 203
Seattle, WA  98104

/s/ Mark C. Rutzick
Mark C. Rutzick
